Mark Baker
1520 E. Covell Blvd. Suite 5-467
Davis, CA 95616
mbaker@moonlightadvocacy.org
Pro Se

(Fee Paid)
FILED
SEP 10 2026
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY BS
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

(PS)

MARK BAKER,

Plaintiff,

v.

CITY OF DAVIS,

Defendant.

Case No. 26 CV 3093 DAD SCR

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. §§ 12131–12134)

## Contents


I. INTRODUCTION ..... 1
II. PARTIES ..... 2
III. JURISDICTION AND VENUE ..... 3
IV. STANDING ..... 3
V. STATEMENT OF FACTS ..... 5
A. Plaintiff's Disabilities ..... 5
B. The City's Rectangular Rapid-Flashing Beacons ..... 6
C. Plaintiff's Initial Notice to the City Regarding RRFBs (January–February 2024) ..... 6
D. The City's Self-Evaluation Notice and 2026 Discussions ..... 8
E. The June 23, 2026 Meeting and Plaintiff's Renewed Notice ..... 9
F. The August 5, 2026 Soft Lights Foundation Letter to the City Council ..... 9
G. The City's August 14, 2026 Determination Letter ..... 10
H. The August 20, 2026 Incident and the City's Undisclosed Notice Requirement ..... 11
I. The August 27, 2026 Incident and the City's Continued Non-Response ..... 11
J. Plaintiff's Request for Mediation Through the Yolo Conflict Resolution Center ..... 12
K. The September 2, 2026 Accommodation Experiment ..... 13
L. The Minnesota Department of Human Rights Finding Regarding a Comparable RRFB Accommodation Request ..... 14
M. FHWA and SAE Standards Governing RRFB Design ..... 14
N. The FHWA's October 19, 2022 Dismissal of a Related RRFB Complaint ..... 15
VI. LEGAL STANDARD ..... 15
A. Pleading Standard ..... 16
B. Title II of the ADA ..... 16
C. Objective Reasonableness of a Requested Accommodation and the Limits of the Fundamental-Alteration Defense ..... 18
D. 28 C.F.R. § 35.105 — The Self-Evaluation Duty ..... 19
E. Duvall v. County of Kitsap — The Individualized Investigation Duty ..... 19
F. 28 C.F.R. § 35.160 — The Duty to Provide Effective Communication ..... 20
G. 28 C.F.R. § 35.164 — Burden of Proof, Documentation, and the Duty to Provide Some Effective Alternative ..... 20
VII. CAUSE OF ACTION ..... 21
1. Violation of Title II's Prohibition on Disability Discrimination ..... 22
2. Failure to Comply with 28 C.F.R. § 35.105 ..... 23
3. Failure to Comply with Duvall v. County of Kitsap ..... 26

4. Failure to Provide Effective Communication Under 28 C.F.R. § 35.160 ..... 30
5. Failure to Comply with 28 C.F.R. § 35.164 ..... 32
6. Pattern of Conduct ..... 34
VIII. RELIEF REQUESTED ..... 34
A. Declaratory Relief ..... 35
B. Injunctive Relief ..... 35
C. Compensatory Damages ..... 35
D. Attorney's Fees and Costs ..... 36
E. Further Relief ..... 36
IX. EXHIBITS ..... 36

**Federal Cases**

*A.J.T. v. Osseo Area Schools, Independent School District No. 279*, 605 U.S. 335 (2025) 1, 17, 36
*Alexander v. Choate*, 469 U.S. 287 (1985) ..... 1
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..... 16
*Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002) ..... 4
*City of Canton v. Harris*, 489 U.S. 378 (1988) ..... 35
*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ..... 3
*Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996) ..... 16, 18
*Duvall v. County of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) ..... passim
*Fortyune v. City of Lomita*, 766 F.3d 1098 (9th Cir. 2014) ..... 18, 25
*Jackson v. Carey*, 353 F.3d 750 (9th Cir. 2003) ..... 16
*Kirola v. City & County of San Francisco*, 860 F.3d 1164 (9th Cir. 2017) ..... 3, 5
*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..... 3
*Martinez v. County of Alameda*, 512 F. Supp. 3d 978 (N.D. Cal. 2021) ..... 21, 32, 33
*McGary v. City of Portland*, 386 F.3d 1259 (9th Cir. 2004) ..... 16, 22
*Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008) ..... 25
*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ..... 16
*Snapp v. United Transportation Union*, 889 F.3d 1088 (9th Cir. 2018) ..... 27
*Tyler v. City of Manhattan*, 849 F. Supp. 1429 (D. Kan. 1994) ..... 19, 23
*Updike v. Multnomah County*, 870 F.3d 939 (9th Cir. 2017) ..... 29, 31
*Weinreich v. L.A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976 (9th Cir. 1997) ..... 17
*Wong v. Regents of the University of California*, 192 F.3d 807 (9th Cir. 1999) ..... 16, 28, 29

**Statutes**

28 U.S.C. § 1331 ..... 3
28 U.S.C. § 1391(b) ..... 3
28 U.S.C. § 2201 ..... 3
28 U.S.C. § 2202 ..... 3
42 U.S.C. § 12102 ..... 5
42 U.S.C. § 12102(2)(A) ..... 17
42 U.S.C. § 12102(4)(A) ..... 17
42 U.S.C. § 12102(4)(D) ..... 5
42 U.S.C. § 12131(1) ..... 3

42 U.S.C. § 12132 .......... passim
42 U.S.C. § 12133 .......... 3
42 U.S.C. § 12205 .......... 36
Cal. Veh. Code § 25400(a) .......... 10
Gov. Code § 54954.2 .......... 10
Minn. Stat. § 363A.12 .......... 14

**Regulations**

28 C.F.R. § 35.105 .......... passim
28 C.F.R. § 35.105(a) .......... 2, 19, 21
28 C.F.R. § 35.105(c) .......... 19
28 C.F.R. § 35.108(d)(1)(i) .......... 17
28 C.F.R. § 35.130(b)(7)(i) .......... passim
28 C.F.R. § 35.150 .......... 28
28 C.F.R. § 35.160 .......... passim
28 C.F.R. § 35.160(a) .......... 31
28 C.F.R. § 35.160(a)(1) .......... 20, 30, 31
28 C.F.R. § 35.160(b)(2) .......... 20, 30, 31
28 C.F.R. § 35.161 .......... 31
28 C.F.R. § 35.163 .......... 31
28 C.F.R. § 35.164 .......... passim
28 C.F.R. 35.105(b) .......... 19
89 Fed. Reg. 31320, 31323 (Apr. 24, 2024) .......... 33

**Rules**

Fed. Rule Civ. Proc. 12(b)(6) .......... 16

**Ordinance**

Davis Mun. Code § 8.17.020 .......... 25
Davis Mun. Code § 8.17.030(f) .......... 26

## I. INTRODUCTION

Forty years ago, the Supreme Court diagnosed disability discrimination as most often the product, not of invidious animus, but of "thoughtlessness and indifference — of benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985); accord *A.J.T. v. Osseo Area Schools, Independent School District No. 279*, 605 U.S. 335, 358 (2025) (Sotomayor, J., concurring) (applying *Choate*'s diagnosis to Title II of the Americans with Disabilities Act ("ADA") by name). Title II answers that diagnosis with two independent duties: a public entity must evaluate its own current practices before anyone is harmed by them, 28 C.F.R. § 35.105, and it must actually investigate a specific individual's needs once notice arises, rather than speculate about what accommodation might work, *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). This is not a case in which a functioning systemic evaluation made individual investigation unnecessary, or in which a genuine individual investigation compensated for an incomplete systemic one. It is a case in which the City of Davis ("City"), confronted with the same recurring subject matter through two independent legal channels over nearly three years, examined it through neither.

This action arises from the City's nearly three year failure to conduct the individualized, fact-specific investigation that Title II of the ADA requires once a public entity receives a request for accommodation, and from the City's related failure to complete a self-evaluation of its Rectangular Rapid-Flashing Beacons ("RRFBs"), a duty 28 C.F.R. § 35.105 has imposed on every public entity since January 26, 1993.

Plaintiff Mark Baker is an individual with autism spectrum disorder and photophobia who is neurologically unable to tolerate high-intensity flashing and strobing light without experiencing pain, panic, involuntary eye closure, and cognitive incapacitation. Beginning January 1, 2024 — nearly three years before the filing of this Complaint — Plaintiff has repeatedly notified the City, in writing, that its use of high-intensity flashing RRFBs at pedestrian crossings throughout Davis creates exactly this barrier, and has asked the City to investigate and adopt specific, objective, administrable modifications. Plaintiff continues to encounter the City's RRFBs in the ordinary course of his regular travel to and through Davis and intends to continue traveling on the City streets they serve, as set forth in the Standing section below.

The City's response, across dozens of letters and nearly three years, has been to provide conclusory statements and denials without ever conducting the individualized investigation *Duvall* requires, as set forth in detail in the Statement of Facts below.

This action asserts a single claim: violation of Title II of the Americans with Disabilities Act. Defendant's liability rests on five failures, each addressed in detail below:

1. Violation of Title II's core prohibition on disability discrimination and its reasonable-modification requirement. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7)(i).
2. Failure to complete the self-evaluation of its RRFBs. 28 C.F.R. § 35.105(a).
3. Failure to undertake the individualized, fact-specific investigation Title II requires once a request for accommodation is made. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).
4. Failure to provide effective communication as required by 28 C.F.R. § 35.160.
5. Failure to comply with the burden-of-proof and documentation requirements of 28 C.F.R. § 35.164.

Plaintiff seeks declaratory relief, injunctive relief, and compensatory damages under Title II of the ADA, as set forth below.

## II. PARTIES

Plaintiff MARK BAKER is a qualified individual with disabilities as defined by the ADA, including autism spectrum disorder and photophobia, entitled to the protections of Title II of the ADA. At all times relevant herein, Plaintiff has resided in Yolo County, California, and regularly travels to and through the City of Davis, within the City's jurisdiction and service area.

Plaintiff is also President of the Soft Lights Foundation, a nonprofit organization addressing the health, safety, and accessibility impacts of high-intensity lighting systems used by public agencies. The claims asserted in this Complaint are Plaintiff's own, brought in his individual capacity for the accommodation denials and injuries described below; Plaintiff's role with the Soft Lights Foundation is noted here because certain correspondence described in the Statement of Facts was sent in that organizational capacity.

Defendant CITY OF DAVIS ("City" or "Davis") is a municipal corporation and public entity within the meaning of 42 U.S.C. § 12131(1). The City owns, operates, and maintains Rectangular Rapid-Flashing Beacons and other traffic-control signaling devices within its jurisdiction.

## III. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 12133 (ADA enforcement). The Court may grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b) because Defendant City is located in this District, Plaintiff resides in this District, and a substantial part of the events giving rise to the claims occurred in this District.

## IV. STANDING

Plaintiff has standing to bring the claim asserted below.

To establish Article III standing, a plaintiff must show an injury in fact that is concrete, particularized, and actual or imminent; that the injury is fairly traceable to the defendant's challenged conduct; and that it is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Where a plaintiff seeks injunctive relief, past exposure to a defendant's conduct does not by itself establish a real and immediate threat of future injury, but a plaintiff who has personally encountered a barrier and faces a credible threat of encountering it again satisfies this standard. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). The Ninth Circuit has held, in a Title II action against a municipality, that a plaintiff may establish injury in fact to pursue injunctive relief through evidence that the plaintiff encountered an access barrier and either intends to return or is deterred from returning to the facility. *Kirola v. City & County of San Francisco*, 860 F.3d 1164, 1174 (9th Cir. 2017).

As used here, 'facility' refers to whatever service, program, or activity is at issue; it does not narrow Title II's reach to fixed buildings. The Ninth Circuit has held that a city's sidewalks are

themselves a 'service, program, or activity' within the meaning of Title II. *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002). The same reasoning extends to any other service a city provides to the public, including its streets and its RRFBs.

Plaintiff has resided in Yolo County, California, since before January 2024 and continues to reside there. Plaintiff regularly travels to and through the City of Davis, and has personally encountered the City's RRFBs on multiple streets and on numerous occasions beginning no later than January 1, 2024, the date of his first written notice to the City. The table below sets forth the encounters Plaintiff is able to document by date and location; Plaintiff has encountered the City's RRFBs on numerous other occasions, in the ordinary course of his travel through Davis, that are not independently dated or documented.

| **Date** | **Location** |
|---|---|
| Jan. 1, 2024 | 5th Street |
| Apr. 9, 2024 | 4th Street |
| Aug. 5, 2026 | 5th Street |
| Aug. 20, 2026 | 5th Street |
| Aug. 27, 2026 | 5th Street |
| Aug. 27, 2026 | F Street |
| Sept. 2, 2026 | Russell Blvd. — Incident 1 |
| Sept. 2, 2026 | Russell Blvd. — Incident 2 |
| Sept. 2, 2026 | E. 14th Street |

That is a period of documented encounter and notice spanning nearly three years, including three separate RRFB strobing incidents within the space of about an hour on September 2, 2026. Plaintiff intends to continue traveling to and through Davis, and, so long as the City's RRFBs continue to operate in their current high-intensity flashing configuration and Plaintiff remains aware of them, he faces a real, credible, and non-speculative threat of repeated future injury each time his travel brings him into their path. This is the kind of ongoing, self-renewing injury the deterrent-effect doctrine recognizes as sufficient for standing to seek injunctive and declaratory relief. *Kirola*,

860 F.3d 1164.

Plaintiff's injury is fairly traceable to Defendant's ownership, operation, and maintenance of the RRFBs at issue and to Defendant's failure to investigate or accommodate the barrier they present, and is redressable by the declaratory and injunctive relief requested below, including an order requiring Defendant to complete the self-evaluation required by 28 C.F.R. § 35.105 and to undertake the individualized investigation *Duvall* requires. Plaintiff separately has standing to seek compensatory damages for the physical and neurological injuries he has already sustained as a direct result of Defendant's conduct.

Plaintiff's injury is not a generalized aversion untethered to any City service that would exist wherever Plaintiff happened to be. It is repeated, documented exposure at specific, identified locations — the RRFBs on 5th Street, 4th Street, F Street, and E. 14th Street — that Defendant owns, operates, and controls as part of its traffic-control and pedestrian-crossing program. Each encounter occurred at one of these specific crossings, on a specific date, and each is independently corroborated by Plaintiff's contemporaneous written correspondence with Defendant or by the table above. Nor does standing under Title II require that Plaintiff reside within Defendant's jurisdiction: it requires only that Plaintiff has personally encountered the barrier and faces a credible threat of encountering it again. *Kirola*, 860 F.3d at 1174. . Plaintiff satisfies that standard independent of where he resides, based on his documented pattern of travel to and through Davis and his repeated, location-specific encounters with these RRFBs.

## V. STATEMENT OF FACTS

### A. Plaintiff's Disabilities

Plaintiff Mark Baker is an individual with disabilities within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12102. Plaintiff has been diagnosed with autism spectrum disorder ("ASD") and photophobia, conditions that substantially limit the major life activities of seeing and neurological function when active. See 42 U.S.C. § 12102(4)(D) (an episodic impairment is a disability if it would substantially limit a major life activity when active). Plaintiff's ASD-related sensory processing disorder and photophobia produce a neurological inability to filter

high-intensity flashing or strobing light. Exposure triggers involuntary eye closure, impaired concentration and cognition, disorientation, and panic. Plaintiff has documented dozens of such reactions to LED flashing lights, including reactions to City-owned or City-operated equipment, and has submitted reports of these reactions to the U.S. Food and Drug Administration.

**B. The City's Rectangular Rapid-Flashing Beacons**

The City owns, operates, and maintains Rectangular Rapid-Flashing Beacons at pedestrian crossings throughout Davis, including on 5th Street, 4th Street, F Street, E. 14th Street, Russell Blvd., and other locations. RRFBs use high-intensity, digitally flashing LED lights to communicate to drivers to stop for pedestrians. Neither the Federal government nor the State has established maximum limits on intensity (luminance in candela per square meter) for RRFBs.

**C. Plaintiff's Initial Notice to the City Regarding RRFBs (January–February 2024)**

On January 1, 2024, Plaintiff submitted a written request for accommodation to ADA Coordinator Jillian LeDuc concerning the City's use of RRFBs at pedestrian crossings, including on 5th Street, asking that the RRFBs be turned off, removed, covered, or replaced with non-LED technology. On February 6, 2024, the City responded that it was reviewing the request with the City's Public Works Department, the California Department of Transportation, and the Federal Highway Administration, and, "[a]s part of the interactive process," asked Plaintiff to: identify every RRFB location for which he sought modification, accommodation, or removal; propose specific alternative traffic control devices and the reasons those alternatives would address his condition — offering as an example whether "a LED flashing beacon at a slower flash sequence" would help; and provide examples of accommodations he had received from other agencies and the reasons those alternatives had worked. The letter stated that the City was "in the process of evaluating the cost, impact and public safety considerations" of altering the RRFBs.

On February 14, 2024, the City advised Plaintiff that, "[p]er our city grievance policy," a determination would issue within sixty days of his request, on or before February 29, 2024, and that the City was "currently conducting an investigation into options and the multitude of

considerations that are involved in such a decision." The letter stated that the City had "used this time to discuss strategies and considerations with the Federal Highway Association, traffic engineers and other civil rights and legal agencies."

On February 29, 2024, the City denied Plaintiff's request, stating that removing or covering the RRFBs "would result in a fundamental alteration of the City's traffic and pedestrian safety program," that "the removal of these traffic signals would pose a direct threat to public safety," and that removal "would result in an undue financial burden." Separately, the letter stated that removal of the RRFBs "would cause a threat to pedestrian safety, because our Traffic Engineer has determined that there are no traffic signals available that would provide a similar level of public safety but which do not involve use of LED technology," citing an estimated replacement cost of $250,000 per location and up to $600,000 "if in proximity to an intersection where signalization would be required," and asserting that a non-LED pedestrian hybrid beacon would need to meet "much higher volume thresholds" to comply with the California MUTCD. The letter repeated that the City had "looked into" the request "through consultation with our Public Works department, the Department of Transportation (DOT), and Federal Highway Association (FHWA)" — the same three entities named in the February 6, 2024 letter — but did not mention the "traffic engineers" or "civil rights and legal agencies" the City's February 14, 2024 letter had separately claimed to have consulted, and did not produce any report, data, or record from any of these consultations. The letter separately invoked the standard that a public entity's programs, "when viewed in their entirety," must be accessible, and asserted that "Title II of the ADA does not require that each route along the City's public street system be accessible for vehicular traffic." As an alternative accommodation, the City offered to help Plaintiff map routes around known RRFB locations. The City did not meet with the Plaintiff to discuss Plaintiff's adverse reactions to LED strobe lights, nor did the City make any indication that the City had engaged with experts to determine the impacts of LED strobe lights on individuals with autism or photophobia. The City did not make any reference to a 28 C.F.R. § 35.105 ADA Self-Evaluation for RRFBs. (A true and correct copy of this letter is attached as Exhibit A.) The City's letter advised Plaintiff of a right to request reconsideration within thirty days; the City's August 14, 2026 letter, discussed below, later took the

position that Plaintiff did not timely exercise that right as to the 2024 determination.

The extent of the City's actual investigation during this period was not disclosed to Plaintiff at the time. Plaintiff learned of it only after submitting a public records request specifically seeking all communications between the City and the National Highway Traffic Safety Administration, the California Department of Transportation, the Federal Highway Administration, and any specialists in autism spectrum disorder or photophobia, and all documents relating to the City's compliance with *Duvall*. In response, the City produced its own internal ADA Title II Records Requests/Complaints Report Log, which records that, between January 8 and February 29, 2024, City staff called the ADA Hotline, contacted the FHWA civil rights team, contacted surrounding cities, reviewed the MUTCD, consulted with Public Works staff and the City Attorney's office, and discussed costs and regulations with a traffic engineer. The log does not record any consultation with a medical or disability-rights specialist regarding autism spectrum disorder or photophobia, any inquiry into what luminance, flash rate, or exposure threshold triggers Plaintiff's specific neurological response, or any attempt to determine what accommodation would be reasonable for Plaintiff individually. The log also records that City staff discussed, internally, the "potential ability to change RRFBs with large yellow flashing lights with slower flash sequence" — an alternative never disclosed to Plaintiff or offered in the City's February 29, 2024 determination. (A true and correct copy of this log is attached as Exhibit B.)

## D. The City's Self-Evaluation Notice and 2026 Discussions

Throughout 2024 and 2025, Plaintiff sent numerous research articles, news stories, and other notices to the City regarding the impacts of strobe lights on individuals with disabilities, and continued to request ADA accommodation.

Beginning in the spring of 2026, Plaintiff and the City corresponded regarding the scope and timing of a self-evaluation of the City's light-based signaling practices under 28 C.F.R. § 35.105. On May 28, 2026, the City confirmed in writing that it intended to initiate an update to its 2010 Self-Evaluation and Transition Plan during the 2026–2027 fiscal year, with completion anticipated by the end of 2027, which will be almost four years after Plaintiff's initial notice

concerning the City's RRFBs. The City has not promised that the Self-Evaluation will address the impacts of RRFBs and other LED strobe lights on individuals with disabilities.

**E. The June 23, 2026 Meeting and Plaintiff's Renewed Notice**

On June 23, 2026, City staff met with Plaintiff to discuss his accommodation requests. At that meeting, Plaintiff requested an individualized, fact-specific investigation consistent with *Duvall*; notified the City that its prior offer of route-mapping around RRFBs was not an effective accommodation because Plaintiff is affected by RRFBs he encounters in the ordinary course of his regular travel to and through Davis, and that avoiding the numerous streets that have RRFBs is exclusionary and impractical; and requested a definite accommodation timeline. City staff asked Plaintiff to identify modifications tied to a particular facility or program. Plaintiff responded, and confirmed in writing that same day, that: the City's failure to complete the self-evaluation 28 C.F.R. § 35.105 requires left it with no evidentiary basis for any accommodation determination; the City's continued use of high-intensity LED flashing was ineffective as a means of communication with Plaintiff because it caused involuntary eye closure and precipitated anxiety and panic; and Plaintiff provided multiple examples of reasonable accommodations relating to safe pedestrian crossings and the City's use of RRFBs.

On July 7, 2026, the City's ADA Coordinator wrote to Plaintiff and the City Attorney, confirming that the City was "still conducting an investigation" of Plaintiff's accommodation requests "[i]n accordance with the City's ADA Grievance Procedure," and that the City would respond within sixty to ninety calendar days of Plaintiff's June 2, 2026 request — on or before August 31, 2026. The August 14, 2026 determination that followed, discussed below, identifies no investigation of alternatives to the City's current RRFB configuration and no investigation of the effects of high-intensity LED flashing on individuals with autism spectrum disorder or photophobia.

**F. The August 5, 2026 Soft Lights Foundation Letter to the City Council**

On August 5, 2026, the Soft Lights Foundation — the nonprofit organization of which

Plaintiff is President — wrote to the Davis City Council requesting that the Council agendize, pursuant to Government Code § 54954.2, a public discussion confirming whether the self-evaluation the City had committed to complete by the end of 2027 would specifically reach a maximum-luminance specification for RRFBs and similar digital signaling devices, for which the letter identified 77.5 cd/m² — a figure derived from California Vehicle Code § 25400(a)'s existing 0.05 candela-per-square-inch limit for diffused, non-glaring vehicle lamps — as an available benchmark. The letter expressly stated that it was not an individual accommodation request and did not ask the City to adopt any specific figure at that time; it asked only that the City Council confirm this category was within the self-evaluation's scope.

Fifteen days later, on August 20, 2026, Plaintiff was personally exposed to the RRFB hazard the August 5, 2026 letter had identified, at the same 5th Street RRFB Plaintiff had first raised with the City in January 2024. By that date, the City had received notice of the RRFB luminance and flash-pattern issue through two independent channels — Plaintiff's individual correspondence beginning January 1, 2024, and the August 5, 2026 organizational letter — and had taken no action in response to either.

## G. The City's August 14, 2026 Determination Letter

On August 14, 2026, the City's ADA Coordinator issued a written determination stating that, "after careful investigation and evaluation," the City concluded that Plaintiff's requested modifications "would create a direct safety risk to the public" and "would fundamentally alter the operation, safety, and functionality of the City's public transportation ... infrastructure." The determination did not identify the official who made the determination, and did not address whether the City had completed the self-evaluation of its RRFBs required by 28 C.F.R. § 35.105. As with the Februrary 29, 2024 denial letter, the August 14, 2026 denial letter made no reference to any consultations with experts on the impacts of LED strobe lights on individuals with photophobia or autism. (A true and correct copy of this letter is attached as Exhibit C.)

As an alternative accommodation, the determination offered light-filtering glasses and noise-cancelling headphones, stating that these items "may be borrowed from the City for the

duration of any visit you make to Davis and returned upon your departure." Plaintiff had not requested these items, these were not Plaintiff's preferred accommodation, and the determination did not identify whether the glasses were prescription or non-prescription, how they were intended to function together with the corrective lenses Plaintiff already wears for an unrelated vision condition, or any testing or data supporting their effectiveness against the strobing effect of high-intensity flashing RRFBs, as opposed to ordinary glare.

**H. The August 20, 2026 Incident and the City's Undisclosed Notice Requirement**

On August 20, 2026, Plaintiff traveled to Davis for the specific purpose of obtaining the light-filtering glasses and noise-cancelling headphones the City had offered in writing six days earlier. While driving into the City on 5th Street, Plaintiff was exposed to strobe-pattern flashing from the same City-owned RRFB Plaintiff had first raised with the City on January 1, 2024. Plaintiff proceeded to 23 Russell Blvd., was directed to the Senior Center on A Street, and located ADA Coordinator Jillian LeDuc. Ms. LeDuc did not have the promised items available and stated, for the first time, that three weeks' advance notice is required to obtain them — a condition never disclosed in the August 14, 2026 letter, which stated only that the items "may be borrowed" for Plaintiff's visit. Plaintiff left without the promised accommodation.

Plaintiff subsequently confirmed that the three-week notice period Ms. LeDuc cited applies, by the City's own published policy, only to enrollment in Parks and Community Services recreation programs — not to general Title II accommodation requests, which the City Manager's Office's own general ADA policy directs be addressed within forty-eight hours of a scheduled event, or, for a request untethered to any scheduled event such as Plaintiff's, sooner.

On August 21, 2026, Plaintiff notified City Manager Daryel Dunston in writing of this discrepancy and of the accommodation's practical unavailability.

**I. The August 27, 2026 Incident and the City's Continued Non-Response**

At 2:50 p.m. on August 27, 2026, Plaintiff sent an email to Ms. LeDuc, City Manager Dunston's office, City Attorney Inder Khalsa, and a fourth recipient, notifying the City that he

would be visiting Davis and requesting ADA accommodation for LED strobe lights before doing so. The City did not respond to this advance notice before Plaintiff encountered either RRFB described below.

While waiting for the signal at 5th and B Streets, Plaintiff was exposed to the intense digital strobes of the RRFB on C Street, which activated without warning. Plaintiff experienced eye pain, was unable to see or safely move his vehicle, and was forced to raise his arms to block the strobes while driving.

Minutes later, Plaintiff encountered additional LED strobes from the RRFB on F Street near Covell Boulevard, where he was again forced to block the strobes with his arms while driving, creating an acute risk of collision independent of the photosensitive injury itself.

Later that day, Plaintiff received a message from Ms. LeDuc stating that the light-filtering glasses and noise-cancelling headphones were "now available" for pickup at the Davis Senior Center. The message did not acknowledge either RRFB encounter Plaintiff had reported.

Plaintiff responded to Ms. LeDuc that same day, again invoking *Duvall* and requesting the specifications for the glasses, evidence that they would be effective against RRFB strobing without impairing his vision, the City's analysis of his preferred accommodation of steady-burning, reduced-luminance RRFB operation, and an explanation of how he was expected to reach City offices without encountering RRFBs. The City did not respond to these questions.

**J. Plaintiff's Request for Mediation Through the Yolo Conflict Resolution Center**

Plaintiff requested mediation of this dispute through the Yolo Conflict Resolution Center ("YCRC"). On August 24, 2026, YCRC confirmed in writing that it had received Plaintiff's request, conducted an individual intake meeting with him, and made multiple attempts to contact the City's ADA Coordinator by email, but was unable to establish contact and, because its mediation services require both parties' participation, concluded its efforts in this matter. (A true and correct copy of the YCRC letter is attached as Exhibit D.) This is a third party's own account of the City's non-response, not Plaintiff's characterization of it.

**K. The September 2, 2026 Accommodation Experiment**

On September 2, 2026, Plaintiff drove to Davis. Plaintiff again encountered the strobing RRFB of Russell Blvd., causing Plaintiff to become agitated and having to block the strobes with his arms. Plaintiff then went to the Senior Center to pick up the specialty glasses. When Plaintiff asked Ms. LeDuc whether the City would conduct the individualized, fact-specific investigation *Duvall* requires to determine a reasonable accommodation for him, Ms. LeDuc responded, "I don't know."

Plaintiff then picked up the specialty glasses from another staff member. When Plaintiff asked the staff member if the glasses were designed for individuals with autism, the staff member showed the Plaintiff a card which said that that the glasses blocked certain wavelengths, including from strobe lights. There was no indication on the card that the glasses were designed for individuals with autism.

Plaintiff then took the glasses, which slipped over Plaintiff's own glasses. The lenses caused everything to turn blue, and the plastic frames were uncomfortable. Plaintiff then proceeded to Russell Blvd. and was again struck by the RRFB strobe lights. The specialty glasses appeared to reduce the glare somewhat but had no impact on the digital strobing. Plaintiff now became even more upset at having been subjected to the RRFB strobe lights twice. Plaintiff returned the glasses to the staff member and informed her that the glasses were not effective.

On the way out of the City, Plaintiff was struck a third time by RRFBs on E. 14th Street, sending Plaintiff into fight or flight mode and causing Plaintiff to become overwhelmed with panic and anxiety which lasted for hours after the RRFB encounters.

On September 3, 2026, Plaintiff wrote to City Manager Daryel Dunston, in his individual capacity and as President of the Soft Lights Foundation, documenting this exchange and enclosing position papers addressing the City's duties under 28 C.F.R. § 35.105 and *Duvall*. The letter stated that, after Plaintiff had raised the *Duvall* requirement with Ms. LeDuc "for several years," the City's own ADA Coordinator "was unable to tell [him] whether the City intends to perform the investigation the law already requires." Plaintiff copied Ms. LeDuc, the City Attorney, and the Davis City Council on the letter.

**L. The Minnesota Department of Human Rights Finding Regarding a Comparable RRFB Accommodation Request**

On June 15, 2023, the Minnesota Department of Human Rights ("MDHR") issued a probable-cause determination finding that a Minnesota city violated the Minnesota Human Rights Act, Minn. Stat. § 363A.12, by failing to reasonably accommodate a resident whose disability was triggered by high-luminance, strobing LED lights emitted by an RRFB the city had installed near her home. (A true and correct copy of the MDHR determination is attached as Exhibit E.) The resident first experienced RRFB-triggered symptoms on January 4, 2022. It took her city more than a year of repeated, unanswered requests before it definitively refused to act, and MDHR's investigation of her subsequent charge — itself another eight and a half months — did not conclude until June 15, 2023, seventeen months after her first exposure. MDHR found that the city ignored at least eight of the resident's written requests for accommodation over more than a year, obtained a vendor quote to replace the RRFB but never analyzed it or brought it to its city council for consideration, declined to explore a slower flash-rate alternative once the vendor was unable to source one, and asserted that removing or altering the RRFB would compromise pedestrian safety without ever consulting any safety data. MDHR specifically held that the city's contention that the RRFB's flash rate was "consistent with federal guidelines" was "irrelevant to the determination of whether providing an accommodation would have imposed an undue hardship."

**M. FHWA and SAE Standards Governing RRFB Design**

The Federal Highway Administration ("FHWA") requires RRFB indications to meet SAE Standard J595 Class 1. Neither SAE J595 Class 1 nor the underlying FHWA and Texas Transportation Institute research on RRFB effectiveness has ever measured luminance or a glare metric; both the standard and the research measure only luminous intensity (candela) and driver yielding behavior. There is no mention in any of FHWA's sponsored research that the impacts of RRFBs on individuals with epilepsy, autism, PTSD, migraines, or other neurological disorders was ever tested.

The Manual on Uniform Traffic Control Devices ("MUTCD"), which incorporated RRFBs into its 11th Edition effective December 2023 and superseded the interim approval under which RRFBs previously operated, requires that each RRFB installation include at least two units — one on each side of the roadway — and requires that the flash rate of each RRFB indication not exceed five flashes per second, specifically "to avoid frequencies that might cause seizures." MUTCD § 4L.03(8). The FHWA requirements do not address whether individuals with disabilities can see, think, or concentrate in the presence of an LED strobe light, regardless of the flash rate. The MUTCD separately permits, but does not require, automatic nighttime dimming of RRFB units where daytime brightness would otherwise cause excessive glare. MUTCD § 4L.02(13). RRFBs are not federally mandated; the MUTCD identifies their use as optional 'to provide supplemental emphasis' at marked crosswalks, not a required device. Whether the City's RRFBs are configured consistent with these federal design parameters is a question the self-evaluation required by 28 C.F.R. § 35.105 has never addressed.

**N. The FHWA's October 19, 2022 Dismissal of a Related RRFB Complaint**

On October 19, 2022, the FHWA Office of Civil Rights notified Plaintiff that it was dismissing, without further investigation, a complaint Plaintiff had filed against three other municipalities — Ashland, Oregon; Little Canada, Minnesota; and Penn Yan, New York — alleging that those cities' use of RRFBs discriminated against individuals with disabilities by inducing "disorientation, visual impairment, anxiety, fear, seizures, and/or other medical/health issues." (A true and correct copy of this letter is attached as Exhibit F.) FHWA's letter stated that it was declining to investigate further based on discretionary enforcement factors, consistent with the Department of Justice's own guidance that "there is no statutory requirement that every Title II complaint receive a full investigation." FHWA further stated that "the allegations you have raised about the health impacts of RRFBs raise complex issues related to the regulation of all Light Emitting Diode (LED) lights, not just those used in RRFBs, that extend beyond FHWA's authority."

**VI. LEGAL STANDARD**

**A. Pleading Standard**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Supreme Court has cautioned that, in reviewing the sufficiency of a complaint, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Whether an ADA modification is "reasonable" or constitutes an "undue burden" or "fundamental alteration" is a fact-intensive inquiry that cannot be resolved at the pleading stage. *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996).

Title II imposes a separate, threshold duty that does not depend on resolving that inquiry: once a public entity receives a request for accommodation, it must undertake an individualized, fact-specific investigation before it may decline the request. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). "[T]he Acts create "a duty to 'gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary to enable [the individual to meet the standards in question]." *Wong v. Regents of the University of California*, 192 F.3d 807, 818 (9th Cir. 1999).

The Ninth Circuit has reversed a Rule 12(b)(6) dismissal where a district court mistakenly required the kind of comparator or disparate-impact evidence relevant to other discrimination theories to state a Title II reasonable-accommodation claim, rather than crediting the plaintiff's allegation that the defendant failed to accommodate his disability. *McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004).

**B. Title II of the ADA**

Title II provides that no qualified individual with a disability shall, by reason of disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132. To state a

claim under Title II, a plaintiff must show: (1) he is a "qualified individual with a disability"; (2) he was excluded from participation in, or denied the benefits of, a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *Duvall*, 260 F.3d at 1135 (9th Cir. 2001) (citing *Weinreich v. L.A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)). The implementing regulation is framed in mandatory terms: a public entity "*shall* make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, *unless* the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i) (emphasis added). Once a plaintiff shows that a requested modification is necessary to avoid disability discrimination, the public entity must make it; demonstrating fundamental alteration is the entity's own burden, and the only ground on which the regulation's mandatory duty gives way.

The first element is not a demanding one. Congress amended the ADA in 2008 specifically to reject a series of Supreme Court decisions that had construed "disability" too narrowly, and directed that the term "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A); accord 28 C.F.R. § 35.108(d)(1)(i) ("The definition of disability... shall be construed broadly."). "Seeing" and neurological function are each an enumerated major life activity. 42 U.S.C. § 12102(2)(A). Whether Plaintiff's diagnosed photophobia and autism spectrum disorder in fact substantially limit those activities when active is, in any event, a factual question that must be accepted as true at the pleading stage.

Nor does this claim require any finding that RRFBs, as a category of traffic-control device, are prohibited by Title II. No such categorical prohibition is alleged or required. Title II does not ban devices or technologies; it requires a public entity to investigate an individual's request for modification and to evaluate its own practices — obligations that exist independent of whether the underlying device is otherwise lawful.

In *A.J.T.*, 605 U.S. 335, the Supreme Court held that a unified deliberate-indifference

standard governs claims for compensatory damages under Title II, requiring a showing that the defendant disregarded a strong likelihood that its conduct would violate a federally protected right.

## C. Objective Reasonableness of a Requested Accommodation and the Limits of the Fundamental-Alteration Defense

Whether a modification would fundamentally alter the nature of a service, program, or activity under Title II requires an individualized assessment of the public entity's actual capacities and obligations, not a categorical assumption that any departure from current practice is disqualifying. *Crowder*, 81 F.3d at 1486 (whether a proposed modification is reasonable or a fundamental alteration is a fact-specific inquiry that cannot rest on the entity's own unexamined policy choice).

A public entity may not treat its own categorical policy choice as conclusive proof of fundamental alteration. *Crowder*, 81 F.3d at 1486 (rejecting a rule that would let a state "evade the antidiscrimination mandate . . . merely by explaining that the state authority considered possible modifications and rejected them"). A safety-based justification for declining a modification must rest on reasonable judgment grounded in current, objective evidence, not generalized fears or unsubstantiated assumptions. *Crowder*, 81 F.3d at 1486.

Compliance with a separate regulatory regime does not establish compliance with Title II. An entity's compliance with one regulatory scheme addressed to a different purpose, and enforced by different law, is not a defense to noncompliance with Title II. Nor does the absence of a specific technical standard excuse noncompliance. The Ninth Circuit has held that Title II's implementing regulations impose a general accessibility mandate on all normal governmental functions, which applies irrespective of whether a technical specification has been adopted for the particular feature at issue, because "the lack of specific regulations cannot eliminate a statutory obligation." *Fortyune v. City of Lomita*, 766 F.3d 1098, 1102 (9th Cir. 2014).

The self-evaluation duty and the individualized-investigation duty described above are not merely parallel; the self-evaluation 28 C.F.R. § 35.105 requires is also the evidentiary foundation the objective-evidence standard above depends on. A self-evaluation, typically prepared with

qualified ADA consultants and maintained in writing as § 35.105(c) requires, is ordinarily the record from which a public entity would draw the luminance data, glare measurements, and comparative analysis of alternatives that an individualized determination under *Duvall* must be grounded in. Neither *Duvall* nor § 35.105 requires that an individualized accommodation determination itself take the form of a published report; the requirement is that the determination be grounded in objective evidence, not that the evidence be formatted any particular way.

Nor can a safety-based justification for declining a requested modification be resolved in the public entity's favor at the pleading stage. A fundamental-alteration defense premised on safety concerns is the entity's own affirmative defense, on which the entity bears the burden of proof, and courts have recognized that determining whether a proposed modification would result in a fundamental alteration "is an intensively fact-based inquiry." *Martinez v. County of Alameda*, 512 F. Supp. 3d 978, 985 (N.D. Cal. 2021).

**D. 28 C.F.R. § 35.105 — The Self-Evaluation Duty**

Each public entity must evaluate its current services, policies, and practices to determine whether they meet Title II's requirements, and must proceed to make necessary modifications. 28 C.F.R. § 35.105(a). This requirement is defined by reference to the entity's current practices, not merely those in place when the regulation took effect; a practice presently in use that has never been evaluated under this standard is non-compliant with § 35.105 regardless of when it was adopted, and is not brought into compliance by an earlier evaluation that did not address it. *Tyler v. City of Manhattan*, 849 F. Supp. 1429, 1437 (D. Kan. 1994) (self-evaluation must address current policies and practices, since "[p]rograms and functions may have changed" since any earlier assessment). Section 35.105(b) requires an opportunity for interested persons, including individuals with disabilities, to comment; § 35.105(c) requires that a written self-evaluation be maintained and available for public inspection for three years.

**E. Duvall v. County of Kitsap — The Individualized Investigation Duty**

Once a public entity receives a request for accommodation — or the need for one is obvious

— it must undertake a fact-specific investigation to determine what constitutes a reasonable accommodation. *Duvall*, 260 F.3d at 1139. "[M]ere speculation that a suggested accommodation is not feasible falls short of the reasonable accommodation requirement; the Acts create a duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are necessary." *Id.*

**F. 28 C.F.R. § 35.160 — The Duty to Provide Effective Communication**

Title II imposes an affirmative duty on public entities to ensure that their communications with individuals with disabilities are as effective as their communications with others. 28 C.F.R. § 35.160(a)(1). In determining what type of aid, service, or modification is necessary to meet that standard, a public entity must give primary consideration to the requests of the individual with the disability. 28 C.F.R. § 35.160(b)(2).

**G. 28 C.F.R. § 35.164 — Burden of Proof, Documentation, and the Duty to Provide Some Effective Alternative**

Section 35.164 sits within the same Subpart E of Title II's implementing regulations as § 35.160, and governs what happens when a public entity believes it cannot meet the § 35.160 duty as requested. Title II's implementing regulations do not permit a public entity to decline a requested modification, or a requested means of effective communication, on the strength of an unexplained, undocumented judgment call. Where personnel of a public entity believe that a proposed modification would fundamentally alter a service, program, or activity, or would impose an undue financial or administrative burden, the public entity bears the burden of proving that conclusion. 28 C.F.R. § 35.164. That determination "must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion." *Id.* Courts applying this framework at the pleading stage have held that determining whether a modification is reasonable or would result in a fundamental alteration "is an intensively fact-based inquiry," and that a public entity's speculative, conclusory assertion that a

requested accommodation is not feasible, unsupported by any fact-specific investigation, does not satisfy this standard. *Martinez v. County of Alameda*, 512 F. Supp. 3d 978, 985 (N.D. Cal. 2021).

Even where a public entity properly establishes that a requested action would cause such an alteration or burden, its obligation does not end there. Section 35.164 further requires that, in that circumstance, the public entity "shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity." 28 C.F.R. § 35.164. A valid finding that the specific action requested would cause a fundamental alteration or undue burden excuses only that specific action; it does not excuse the entity from providing some other, lesser accommodation that comes as close as possible to the benefit the individual sought. Title II thus imposes two distinct duties relevant here: a duty to provide effective communication in the first instance, § 35.160, and, where that duty is validly excused as to a particular request, a further duty to provide at least some effective alternative that ensures access to the maximum extent possible, § 35.164.

## VII. CAUSE OF ACTION

### Violation of Title II of the Americans with Disabilities Act (42 U.S.C. §§ 12131–12134)

Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

Defendant's liability under this Cause of Action rests on the following failures, each addressed in turn below:

1. Violation of Title II's core prohibition on disability discrimination and its reasonable-modification requirement. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7)(i).
2. Failure to complete the self-evaluation of its current RRFBs required by 28 C.F.R. § 35.105(a).
3. Failure to undertake the individualized, fact-specific investigation Title II requires once a request for accommodation is made. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).
4. Failure to provide effective communication as 28 C.F.R. § 35.160 requires.

5. Failure to comply with the burden-of-proof, documentation, and maximum-extent-possible requirements of 28 C.F.R. § 35.164.

**1. Violation of Title II's Prohibition on Disability Discrimination**

Questions of law: that no qualified individual with a disability may, by reason of disability, be excluded from participation in or denied the benefits of a public entity's services, programs, or activities, 42 U.S.C. § 12132; and that a public entity bears the burden of proving that a requested modification would fundamentally alter the nature of the service, program, or activity, 28 C.F.R. § 35.130(b)(7)(i); Section VI.C above.

Questions of fact, resolved by Defendant's own record: whether Defendant has carried that burden as to Plaintiff's requested modification.

Defendant cannot resolve this element by characterizing Plaintiff's condition as mere "light sensitivity." Nor does this claim require proof that RRFBs, as a category of device, are categorically prohibited by Title II; a defendant that treats a reasonable-accommodation claim as though it required such proof has mischaracterized the claim in exactly the manner the Ninth Circuit has rejected. *McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004).

Plaintiff's photophobia and autism-related sensory processing disorder produce a neurological inability to filter high-intensity flashing or strobing light, as set forth in the Statement of Facts above. On August 20, 2026, Plaintiff was exposed to strobe-pattern flashing from the 5th Street RRFB while attempting to obtain the substitute accommodation Defendant had promised in writing six days earlier. One week later, on August 27, 2026, after providing Defendant advance written notice and requesting accommodation before entering the City, Plaintiff was struck twice more within minutes — by the RRFB on C Street and, shortly after, by the RRFB on F Street near Covell Boulevard. The following week, on September 2, 2026, Plaintiff was struck three times by RRFBs in less than an hour as Plaintiff attempted to pick up and use the specialty glasses that Defendant offered as accommodation. On each occasion, exposure to Defendant's RRFBs interfered with Plaintiff's ability to see, think, and concentrate, and with Plaintiff's path of travel, and forced Plaintiff to raise his hand or arms to block the strobes while driving, creating an acute

risk of collision independent of the photosensitive injury itself. Defendant's own August 14, 2026 determination letter records that Plaintiff described "impaired concentration, cognitive difficulties, involuntary shutting of the eyes, and panic attacks" resulting from this exposure.

Plaintiff's requested modification — that the RRFBs be turned off, removed, covered, replaced with non-LED technology, or operated at reduced luminance — does not ask Defendant to alter the service, program, or activity Title II protects. That program is Defendant's provision of safe pedestrian and vehicle access to its streets and sidewalks; RRFBs are merely one technology Defendant has chosen to help implement that program at particular crossings, not the program itself. Defendant has not carried, and for the reasons set forth in Section VI.C above cannot carry, its burden of demonstrating that adopting an alternative technology or crossing design — such as a standard red/yellow/green traffic signal or a raised crosswalk — to serve that same underlying purpose would fundamentally alter the nature of pedestrian and vehicle access to the City. 28 C.F.R. § 35.130(b)(7)(i).

**2. Failure to Comply with 28 C.F.R. § 35.105**

Questions of law: that Title II imposes an independent, entity-initiated obligation on each public entity to evaluate its current services, policies, and practices to identify those that do not, or may not, meet Title II's requirements, and to proceed with any necessary modifications — a duty that does not depend on Plaintiff having asked for anything. 28 C.F.R. § 35.105.

Questions of fact, resolved by Defendant's own record: whether Defendant's 2010 self-evaluation, or any update to it, has ever addressed RRFB or LED strobe technology.

Defendant's self-evaluation dates to 2010. As of May 28, 2026, Defendant advised that it "intends to initiate an update to its 2010 Self-Evaluation and Transition Plan" during the 2026–2027 fiscal year — sixteen years after the prior evaluation, and nearly three years after Plaintiff first raised the specific RRFB barrier addressed in this Complaint. In *Tyler v. City of Manhattan*, 849 F. Supp. 1429, 1437 (D. Kan. 1994), the court wrote "[T]he regulations impose an affirmative duty on the City to ensure its services, programs, and activities are accessible to those with disabilities. The City is required by the regulations to conduct a self-evaluation to identify

compliance deficiencies, and proceed to correct those deficiencies whether or not a particular qualified individual with disabilities is presently excluded from access by such deficiencies" and held that a Title II self-evaluation must assess a public entity's current services, policies, and practices, not an outdated snapshot, because "[p]rograms and functions may have changed" since a prior evaluation. Plaintiff is aware of no indication that Defendant's 2010 evaluation assessed the LED strobe technology now deployed on its RRFBs, and nothing in the record indicates Defendant has gone back to evaluate that technology since, notwithstanding having been on notice of these specific concerns since January 2024.

Defendant's own published safety standard for RRFBs illustrates the gap this failure has left unaddressed. The Federal Highway Administration requires RRFB indications to meet SAE Standard J595 Class 1, but neither that standard nor the underlying FHWA and Texas Transportation Institute research on RRFB effectiveness has ever measured luminance or a glare metric such as Unified Glare Rating — both measure only luminous intensity (candela) and driver yielding behavior. Defendant's February 29, 2024 letter told Plaintiff that "the City of Davis is required to be in compliance with federal and state regulations of traffic control devices," as though that obligation weighed against removing or modifying the RRFBs. It does not. RRFBs are optional supplemental emphasis, not a required element of a compliant crossing; the underlying crosswalk, with its standard pedestrian warning signage, already satisfies the MUTCD's baseline requirements without an RRFB at all. Removing or modifying the RRFB accordingly removes no federally mandated safety measure; it returns the crossing to a configuration the MUTCD itself treats as adequate. Defendant's own invocation of its regulatory compliance obligations, then, cuts against its position, not in favor of it.

The MUTCD, which incorporated RRFBs into its 11th Edition effective December 2023, separately requires that the flash rate for RRFB indications not exceed five flashes per second specifically "to avoid frequencies that might cause seizures," MUTCD § 4L.03(8), confirming that FHWA itself treats the photobiological mechanism Plaintiff has described as a real design constraint, and permits, but does not require, nighttime dimming of RRFB units, MUTCD § 4L.02(13) — a parameter Defendant's self-evaluation has never addressed. Plaintiff offers these

facts not as an independent cause of action, but as direct evidence that Defendant's February 29, 2024 and August 14, 2026 determinations were issued without the analytical predicate Title II requires, and as evidence relevant to the scope of injunctive relief warranted once liability under this Cause of Action is established. See *Pierce v. County of Orange*, 526 F.3d 1190, 1223 (9th Cir. 2008) (a public entity's failure to timely complete a required self-evaluation or transition plan bears on the scope of injunctive relief). That neither SAE J595 nor FHWA's RRFB research has ever measured luminance or glare does not exempt Defendant's RRFBs from Title II's general accessibility mandate; "the lack of specific regulations cannot eliminate a statutory obligation." *Fortyune v. City of Lomita*, 766 F.3d at 1102.

FHWA's own account of its authority confirms the gap Defendant's reliance on federal standards leaves unfilled. In an October 19, 2022 letter dismissing a related complaint against other municipalities, FHWA stated that the health impacts of RRFB-type LED lighting "raise complex issues... that extend beyond FHWA's authority." (Ex. F). An agency that disclaims authority to investigate this question has not investigated it; the duty to do so falls to the public entity that deploys the technology, through the self-evaluation 28 C.F.R. § 35.105 requires. Defendant cannot rely on FHWA's silence on this question as though it were an answer, when FHWA has said directly that the question is not one it addresses at all.

A completed self-evaluation is ordinarily where the luminance and glare data, and the comparative analysis of alternatives, supporting an individualized determination would reside. Defendant's February 29, 2024 and August 14, 2026 determinations show why that matters: each states a conclusion — fundamental alteration, direct threat, undue burden — without citing any self-evaluation finding, consultant report, or investigation record supporting it, because no such record exists. Defendant did not skip a formality; it skipped the step that would have given its conclusions something to rest on.

Defendant's own municipal code undermines the premise that maximizing glare promotes safety. The City's Outdoor Lighting Control ordinance defines "glare" as "artificial light that causes annoyance, discomfort, or loss of visual performance and visibility," Davis Mun. Code § 8.17.020, and requires that outdoor lighting be shielded specifically to "minimize glare extending toward

roadways where impairment of motorist vision might cause a hazard." *Id.* § 8.17.030(f). It is difficult to reconcile Defendant's characterization of high-intensity strobing as a safety feature with its own recognition, codified in that same municipal code, that glare of exactly this kind is a roadway hazard to be minimized, not a mechanism to be deployed. Defendant has never explained why this same principle — that glare impairing a driver's vision is a hazard, not a safety feature — does not apply to its RRFBs, with glare high enough that the City offered the Plaintiff specialty glasses just to block the glare. An RRFB that produces the kind of visual impairment Defendant's own ordinance recognizes as a roadway hazard may cause some drivers to stop not because they have registered a pedestrian's presence, but because high-intensity strobing has degraded their ability to see the road ahead. Defendant has never investigated which of these two mechanisms accounts for its RRFBs' reported effect on driver behavior — and its self-evaluation, had one been performed, is precisely where that inquiry would belong.

An adequate self-evaluation would, at minimum, have examined whether feasible alternatives short of Defendant's current RRFB configuration exist for the crossings at issue — for example: (1) standard red-yellow-green traffic signals in place of RRFBs; (2) steady-burning, gradually-illuminating warning lights rather than high-intensity strobe patterns; (3) raised crosswalks; and (4) curb extensions (bulb-outs) and pedestrian refuge islands. Plaintiff does not ask this Court to determine, on this record, whether any of these alternatives is safe, effective, or appropriate for a particular intersection — that evaluation is precisely the evidence-based investigation § 35.105 require Defendant, not this Court, to perform in the first instance. Plaintiff asks only that the Court direct Defendant to undertake that investigation, an inquiry Defendant has never conducted for any of its RRFBs.

**3. Failure to Comply with Duvall v. County of Kitsap**

Questions of law: that a public entity receiving a request for accommodation must undertake an individualized, fact-specific investigation to determine what constitutes a reasonable accommodation, rather than speculate about its feasibility. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).

Questions of fact, resolved by Defendant's own record: whether Defendant's February 29, 2024 and August 14, 2026 determinations reflect that individualized investigation, or instead reflect generalized, program-wide assumptions untested against Plaintiff's specific circumstances; and whether Defendant's own ADA Coordinator's September 2, 2026 admission that she did not know whether such an investigation would occur is consistent with one having occurred at any point in the preceding nearly three years.

The factual pattern *Duvall* addressed maps onto this record. Just as Mr. Duvall explained to Kitsap County, in his own account, the impact of his hearing impairment, Plaintiff has explained to Defendant the impact of RRFB strobing: the pain, panic, involuntary eye closure, and cognitive incapacitation described above and recorded in Defendant's own August 14, 2026 letter.

As in *Duvall*, where the Kitsap County substituted an unproven auxiliary device for the accommodation the Mr. Duvall had identified, without investigating whether his requested accommodation — videotext transcription — was feasible, *id.* at 1131–32, Defendant here substituted borrowed, unspecified light-filtering glasses for the accommodation Plaintiff identified — that the RRFBs be turned off, removed, covered, replaced with non-LED technology, or operated at reduced luminance — without identifying the brand, model, or specifications of the glasses, or any testing or data supporting their effectiveness against RRFB strobing, despite Plaintiff's repeated requests for that information. *Duvall*'s comparison is apt here for the same reason: one is a fix to the underlying condition; the other is an external aid of undemonstrated effectiveness that must be re-obtained on each visit.

This is not a freestanding claim that Defendant's investigative process was inadequate in the abstract; there is no such claim under Title II. The discrimination here is the denial of an available and reasonable accommodation that Defendant's failure to investigate produced: Defendant's continued operation of RRFBs that exclude Plaintiff from streets he has a right to use, and the substitute accommodation Defendant offered instead, which proved unavailable when Plaintiff sought to use it on August 20, 2026. The investigative failure is the reason that denial occurred; it is not, itself, a separate wrong.

Defendant's February 29, 2024 determination compounds this failure with a separate legal

error: it applied the wrong regulatory standard. The letter asserted that Title II requires public programs to be accessible only "when viewed in their entirety," and that "Title II of the ADA does not require that each route along the City's public street system be accessible for vehicular traffic." That standard — program accessibility for existing facilities under 28 C.F.R. § 35.150 — answers a different question than the one Plaintiff's request presented. Plaintiff did not ask Defendant to make every street in Davis accessible; he asked Defendant to investigate and provide a reasonable modification to specific RRFBs he personally and repeatedly encounters, a request governed by 28 C.F.R. § 35.130(b)(7)(i) and *Duvall*, not by § 35.150's program-wide standard. The premise underlying Defendant's invocation of that standard — that Plaintiff could simply use other, RRFB-free routes — is also factually unsupported on this record: Plaintiff told Defendant, including at the June 23, 2026 meeting described above, that RRFBs are installed on numerous streets throughout Davis, making avoidance exclusionary and impractical rather than a genuine alternative. An agency that evaluates an individualized modification request under the wrong regulatory framework, resting on a factual premise the record does not support, has not performed the investigation *Duvall* requires, regardless of the conclusion it reaches.

"The ADA imposes an obligation to investigate whether a requested accommodation is reasonable," and "[m]ere speculation that a suggested accommodation is not feasible falls short of the reasonable accommodation requirement." *Duvall*, 260 F.3d at 1136 (quoting *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999)). Rather than itself investigate Plaintiff's individualized circumstances, Defendant's February 6, 2024 response asked Plaintiff to identify and justify specific alternative traffic-control devices on the City's own behalf, and to supply precedent from other agencies' past accommodations — none of Defendant's three questions asked what luminance, flash rate, or other objective threshold triggers Plaintiff's photophobic response, or what accommodation might address his individual neurological condition. *Duvall* requires the public entity to gather sufficient information "from the disabled individual and qualified experts," *id.* (quoting *Wong*, 192 F.3d at 818) — a duty that runs to the entity, not a questionnaire that outsources the underlying engineering and medical analysis to the individual seeking accommodation. On February 14, 2024, Defendant represented that it was "currently conducting an investigation" and

had "used this time to discuss strategies and considerations with the Federal Highway Association, traffic engineers and other civil rights and legal agencies." Fifteen days later, Defendant's February 29, 2024 denial repeated its earlier reference to consulting Public Works, DOT, and FHWA, but never mentioned the additional "traffic engineers" or "civil rights and legal agencies" its own February 14, 2024 letter had separately claimed to have consulted, and did not produce any report, data, or record from any of these consultations to substantiate its conclusions. Without engaging any of the specific alternatives Plaintiff had already identified in his original request, Defendant's denial rested on generalized, program-wide assertions — an estimated $250,000 to $600,000 replacement cost per location and a bare assertion of fundamental alteration — without the individualized investigation into Plaintiff's specific circumstances *Duvall* and *Updike v. Multnomah County*, 870 F.3d 939, 954 (9th Cir. 2017), require. Defendant's August 14, 2026 determination fares no better: it does not identify the deciding official and does not engage with the specific luminance figure Plaintiff had proposed.

The City's own internal log confirms the same gap directly, rather than by inference. As set forth in the Statement of Facts above, the log the City produced in response to Plaintiff's public records request documents an extensive investigation of general regulatory questions — the MUTCD, FHWA civil rights guidance, other cities' practices, replacement costs — but no investigation of the question *Duvall* actually asks: what accommodation is reasonable for this individual. *Duvall* does not merely require that a public entity investigate; it requires that the entity investigate the individual's circumstances specifically, gathering information "from the disabled individual and qualified experts." *Duvall*, 260 F.3d at 1136 (quoting *Wong*, 192 F.3d at 818). A log documenting weeks of engineering and regulatory research, with no corresponding effort to understand Plaintiff's own neurological response, is direct, contemporaneous evidence that the City investigated the wrong question.

Rather than adopt Plaintiff's request, decline it with individualized reasons, or propose a genuine alternative addressing the barrier itself, Defendant substituted route-mapping — a workaround that does not modify the RRFBs' operation at all, but simply asks Plaintiff to avoid known locations, leaving the barrier he experiences throughout the City untouched. Plaintiff

informed Defendant on June 23, 2026, that this substitute was not an effective accommodation because he encounters RRFBs throughout the City in the ordinary course of his regular travel to and through Davis. Defendant never investigated further and never provided cost estimates or safety data for standard red/yellow/green traffic signals, a slow glowing yellow light, raised sidewalks, bulb outs, or any other non-LED strobe light option.

The clearest evidence that Defendant has not conducted, and does not know whether it will conduct, the investigation *Duvall* requires comes from Defendant's own ADA Coordinator. On September 2, 2026, when Plaintiff asked her directly whether the City would conduct the individualized, fact-specific investigation *Duvall* requires to determine a reasonable accommodation for him, she answered, "I don't know." That admission followed nearly three years of correspondence in which Defendant repeatedly represented that an investigation was underway or would be undertaken — including the City's February 6, 2024, February 14, 2024, and July 7, 2026 letters described above. A public entity cannot simultaneously represent, across multiple written determinations, that it has investigated or is investigating a request, while the official responsible for administering its ADA obligations is unable to confirm that any individualized investigation has occurred, is occurring, or is planned.

**4. Failure to Provide Effective Communication Under 28 C.F.R. § 35.160**

Questions of law: that Title II requires a public entity to give primary consideration to the accommodation an individual with a disability requests, 28 C.F.R. § 35.160(b)(2), and to ensure that its communications with individuals with disabilities are as effective as its communications with others, 28 C.F.R. § 35.160(a)(1); Section VI.F above.

Questions of fact, resolved by Defendant's own record: whether Defendant engaged with the specific luminance benchmark Plaintiff proposed; and whether the accommodation Defendant offered was, in practice, available and effective when Plaintiff sought to use it.

Section 35.160(a)(1)'s effective-communication mandate is written in general terms, reaching a public entity's communications with "applicants, participants, members of the public, and companions with disabilities" — not confined to any single disability or communication

medium. 28 C.F.R. § 35.160(a)(1). The regulations addressing telephone relay systems and text telephone access, 28 C.F.R. §§ 35.161–35.163, are a specific application of that general rule to one medium — telephonic communication for individuals who are deaf or hard of hearing. They do not narrow the general rule § 35.160(a) itself states, and no court has held that they do. Public entities' own ADA compliance practice confirms the broader reading: the City of Seattle's Department of Transportation ADA Committee has recognized that Title II's effective-communication mandate extends to Accessible Pedestrian Signals, audible and vibrotactile pedestrian-crossing signals, because such signals convey time-sensitive safety information in the same manner an RRFB does. There is no principled basis to treat one traffic-signaling device as communication for Title II purposes and treat another, conveying the identical kind of information through a different sensory channel, as mere infrastructure entirely outside § 35.160's reach.

Defendant did not adopt, decline with reasons, or otherwise engage with the specific luminance benchmarks Plaintiff has proposed, in violation of the primary-consideration duty 28 C.F.R. § 35.160(b)(2) imposes. And the accommodation Defendant did offer failed the first time Plaintiff attempted to use it: six days after the August 14, 2026 determination represented that the glasses and headphones "may be borrowed from the City for the duration of any visit," Plaintiff traveled to Davis to collect them and was told, for the first time, that three weeks' advance notice was required — a condition the determination never disclosed, and one that does not, in fact, apply to Plaintiff's request under Defendant's own published policies. Defendant's subsequent notice that the items were "now available" on August 27, 2026, still did not address the RRFB encounters Plaintiff had reported that same day. An accommodation that is not actually available when the individual who was promised it attempts to obtain it, and a device offered without any evidence of its effectiveness, are not effective communication within the meaning of 28 C.F.R. § 35.160(a)(1). See *Updike*, 870 F.3d at 944, 956. Defendant's RRFBs exist to communicate a hazard or instruction to the public; for Plaintiff, exposure to these devices does not communicate information — it produces involuntary eye closure, panic, and cognitive incapacitation, precisely the effect the RRFBs had on Plaintiff on August 20, 2026, August 27, 2026, and September 2, 2026, when he was repeatedly forced to block the strobes with his hands while driving. A communication that

incapacitates its intended recipient rather than informing them is not, as to that recipient, an effective communication.

**5. Failure to Comply with 28 C.F.R. § 35.164**

Questions of law: that where a public entity declines a requested modification as a fundamental alteration or undue burden, the entity bears the burden of proving that conclusion, the determination must be made by the head of the entity or a designee after considering the resources available to the program, and the determination must be accompanied by a written statement of reasons; and that, even where the entity validly establishes such an alteration or burden, it must still take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity. 28 C.F.R. § 35.164; Section VI.G above.

Questions of fact, resolved by Defendant's own record: whether Defendant's determinations identify a deciding official, document consideration of the City's overall resources, and include a written statement of reasons; and whether the alternatives Defendant actually offered — route-mapping and the glasses and headphones — ensure, to the maximum extent possible, that Plaintiff receives the benefit of Defendant's streets and services.

Neither Defendant's February 29, 2024 denial nor its August 14, 2026 determination satisfies the documentation requirement: neither identifies the official who made the fundamental-alteration or undue-burden finding, neither documents that the decision-maker considered the resources available to the City's RRFB program, and neither includes the written statement of reasons § 35.164 requires.

Defendant's own language illustrates the gap *Martinez* identifies. The August 14, 2026 determination states that the City "concluded that [Plaintiff's] requested modifications ... would create a direct safety risk to the public" and "would fundamentally alter the operation, safety, and functionality of the City's public transportation ... infrastructure" — but nowhere explains what about the modification creates that risk, what data or analysis supports it, or what specifically would be altered and how. A restatement of the legal standard's own vocabulary is not the "written

statement of reasons" § 35.164 requires; it is the conclusory assertion *Martinez* held insufficient even at the pleading stage.

Plaintiff does not contend that the cost of an accommodation is zero. But § 35.164 requires that any assertion of undue financial burden be evaluated "after considering all resources available for use in the funding and operation of the service, program, or activity" — a comparison Defendant's February 29, 2024 determination never performed, measured against the entity's overall resources, not a single department's budget. In its own 2024 Title II rulemaking, the Department of Justice used exactly this comparison, concluding that compliance costs "generally estimated to be below 1 percent of revenues" for public entities do not constitute an undue burden. 89 Fed. Reg. 31320, 31323 (Apr. 24, 2024). Measured against Defendant's own publicly adopted budget, the $600,000 figure Defendant cited as the high end of RRFB-replacement cost is approximately 0.62% of the City's roughly $97 million General Fund for fiscal year 2025–26, and approximately 0.24% of the City's roughly $250 million total budget across all funds for the same period — in either case, well below the threshold the Department of Justice itself has found consistent with compliance, not undue burden.

Even if Defendant could properly establish that removing, covering, or dimming its RRFBs would cause a fundamental alteration or undue burden — which, for the reasons above, it cannot — its obligations under § 35.164 would not end there. Section 35.164 further requires that, where a requested action would cause such an alteration or burden, the public entity "shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity." 28 C.F.R. § 35.164. Defendant's only offered alternatives — route-mapping around known RRFB locations, and borrowed light-filtering glasses — fail this standard on the facts already alleged. Plaintiff told Defendant, including at the June 23, 2026 meeting described above, that route-mapping does not work because RRFBs are installed on numerous streets throughout Davis, making avoidance exclusionary and impractical rather than a genuine alternative. The glasses were not available when Plaintiff traveled to Davis to collect them on August 20, 2026, conditioned on a three-week notice requirement the determination offering them

never disclosed, and on September 2, 2026, when Plaintiff attempted to use the specialty glasses, Plaintiff found them to be ineffective. An entity that offers only alternatives its own record shows do not work has not ensured, to the maximum extent possible, that Plaintiff receives the benefit of Defendant's streets and services; it has offered the appearance of compliance without the substance § 35.164 requires.

**6. Pattern of Conduct**

The pattern of conduct described above is not unique to Defendant. On June 15, 2023, a Minnesota civil rights agency examined a materially similar fact pattern — a small city's failure to accommodate a resident whose disability was triggered by an RRFB it had installed — and reached the same conclusion this record compels. The Minnesota Department of Human Rights found that the city ignored at least eight written accommodation requests over more than a year, never analyzed a vendor's cost quote for an alternative, and asserted a safety justification without ever consulting any safety data; MDHR held that the city's invocation of the RRFB's compliance with federal flash-rate guidelines was "irrelevant to the determination of whether providing an accommodation would have imposed an undue hardship." (Exhibit D.) The Minnesota Human Rights Act is not Title II, and that determination does not bind this Court. But a different regulatory body, applying a different disability-rights statute to a different city's RRFB, rejected the same defense Defendant raises here — that compliance with federal traffic-engineering standards answers the accommodation question, see Section VI.C above — and found liability on the same absence of any documented investigation or safety analysis that this record shows. The parallel is instructive: it demonstrates that Defendant's course of conduct is not a defensible application of an unsettled legal standard, but a recognizable pattern that another public body, applying an analogous accommodation framework, has already found insufficient.

**VIII. RELIEF REQUESTED**

WHEREFORE, Plaintiff prays for judgment against Defendant City of Davis as follows:

**A. Declaratory Relief**

A judicial declaration that Defendant has violated 42 U.S.C. § 12132 by continuing to operate its Rectangular Rapid-Flashing Beacons in a manner that interferes with Plaintiff's path of travel and does not provide him effective communication, without completing the self-evaluation 28 C.F.R. § 35.105 requires and without undertaking the individualized, fact-specific investigation *Duvall v. County of Kitsap* requires.

**B. Injunctive Relief**

An order requiring Defendant, as a remedy for the violation described above, to: (a) complete a self-evaluation of its RRFB practices under 28 C.F.R. § 35.105, within a time certain and including a public comment period of no fewer than thirty days; (b) undertake and document the individualized, fact-specific investigation that 28 C.F.R. § 35.160 and *Duvall v. County of Kitsap* require, addressing the RRFBs on 5th Street, 4th Street, F Street, Russell Blvd., and E. 14th Street; (c) issue any determination declining Plaintiff's requested modification in the manner 28 C.F.R. § 35.164 requires; and (d) ensure that any accommodation the City represents in writing that it will provide is, in fact, effective for Plaintiff and available on the terms represented.

**C. Compensatory Damages**

"Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood," and a plaintiff who has alerted the public entity to his need for accommodation satisfies the notice element. *Duvall*, 260 F.3d at 1139 (citing *City of Canton v. Harris*, 489 U.S. 378 (1988)). Plaintiff satisfied that element no later than January 1, 2024, and reinforced it repeatedly thereafter, including at 2:50 p.m. on August 27, 2026, when he notified Defendant in writing, before entering Davis, that he required accommodation from RRFB strobes — notice Defendant did not act on before Plaintiff was struck twice that same afternoon. Given the length and specificity of this record — spanning nearly three years, including a specific benchmark proposal left unaddressed for weeks before the August 14, 2026 determination issued, and no response to Plaintiff's August 27, 2026 advance notice before he was struck twice

— this pattern is not fairly characterized as isolated negligence. This constitutes deliberate indifference under *A.J.T. v. Osseo Area Schools, Independent School District No. 279*, 605 U.S. 335 (2025), establishing Defendant's liability for compensatory damages.

Compensatory damages, in an amount to be proven at trial, for the physical and neurological injuries Plaintiff suffered as a result of Defendant's deliberate indifference to Plaintiff's federally protected rights under Title II of the ADA, as set forth above, see *A.J.T. v. Osseo Area Schools, Independent School District No. 279*, 605 U.S. 335 (2025) (a showing that the defendant disregarded a strong likelihood that its conduct would violate a federally protected right establishes deliberate indifference and entitles a plaintiff to compensatory damages under Title II).

**D. Attorney's Fees and Costs**

Reasonable attorney's fees and costs of suit as authorized by 42 U.S.C. § 12205.

**E. Further Relief**

Such other and further relief as the Court deems just and proper.

## IX. EXHIBITS

Plaintiff attaches and relies on the following exhibits, true and correct copies of which are attached to this Complaint:

Exhibit A — City of Davis Determination Letter (Feb. 29, 2024).

Exhibit B — City of Davis ADA Title II Records Requests/Complaints Report Log (2023–2026).

Exhibit C — City of Davis Determination Letter (Aug. 14, 2026).

Exhibit D — Minnesota Department of Human Rights Probable Cause Determination, Ref. 74059 (June 15, 2023).

Exhibit E — Letter from the Yolo Conflict Resolution Center (Aug. 24, 2026).

Exhibit F — Federal Highway Administration Office of Civil Rights Letter, DOT#2022-0375 (Oct. 19, 2022).

Dated: September 10, 2026

Respectfully submitted,

Mark Baker

/s/ Mark Baker

Mark Baker, Pro Se

# EXHIBIT A

Davis
CALIFORNIA

February 29th, 2024

Hello Mr. Baker,

This letter shall serve as my response to your reasonable accommodation request submitted to the City by email on January 1, 2024 relating to the City's use of rectangular rapid flashing beacons (RRFBs) at certain pedestrian crossings on public streets in the City of Davis. You have asked that "the RRFBs be turned off and either removed or at least covered up" and informed the City that the RRFBs have prevented you from accessing "the use of streets and sidewalks", specifically 5th St while you are driving through the City. You have also requested that the City replace the RRFBs with non-LED technology, such as a signal containing a tungsten filament. I have also reviewed the additional correspondence that you submitted to the City by email since that time in support of your reasonable accommodation request, and also sent you a request for clarification on February 6, 2024.

Based on our review of your correspondence and the information that you provided, and consideration of applicable laws and regulations, at this time, we find that removal or covering up of the RRFBs would result in a fundamental alteration of the City's traffic and pedestrian safety program, and based upon the circumstances leading the City to install the RRFBs, the removal of these traffic signals would pose a direct threat to public safety. In addition, removal of the RRFBs would result in an undue financial burden on the City. We would like to offer an alternative accommodation that will achieve access to the use of the street in an equally effective manner.

Under Title II of the Americans with Disabilities Act (ADA), a state or local government's public programs and services, when viewed in their entirety, must be accessible to people with disabilities, but not all facilities must necessarily be made accessible if alternative, accessible locations are available. Title II of the ADA does not require that each route along the City's public street system be accessible for vehicular traffic.

As we previously informed you, we looked into your request through consultation with our Public Works department, the Department of Transportation (DOT), and Federal Highway Association (FHWA). The City of Davis is required to be in compliance with federal and state regulations of traffic control devices, and any proposed change to current traffic signals would need to be approved and in compliance with the CA MUTCD and other governing standards. These safety improvements are critical safety infrastructure for the Davis community and exist to promote accessibility in accordance with the ADA, the Accessibility Guidelines for Pedestrian Facilities in the Public Right-of-Way (PROWAG), and Federal Highway Associations Manual of Traffic Control Devices (MUTCD). Davis, in particular, has much higher active modes of transportation, such as walking and biking.

The removal of any beacons would cause a threat to pedestrian safety, because our Traffic Engineer has determined that there are no traffic signals available that would provide a similar level of public safety but which do not involve use of LED technology and would otherwise meet

CA MUTCD standards. In addition, replacement of the RRFBs, even if otherwise acceptable from a traffic and pedestrian safety standpoint, would require an expenditure of at least $250,000 per location, and upwards of $600,000 if in proximity to an intersection where signalization would be required. Under the applicable traffic and safety standards, each device has criteria established and regulated usage. In the CA MUTCD, installation of a non-LED pedestrian hybrid beacon (PHB) needs to meet much higher volume thresholds in order to be installed in compliance with regulatory requirements.

Based on this guideline, the City of Davis would like to offer an available alternative route as an accommodation that would be reasonable and effective and would not constitute an undue hardship. The alternate accommodation being offered is assistance with mapping routes to avoid any RRFB identified. If you provide us with locations and times you are traveling to and from the City, we can help establish an alternate routes for you to take. There are multiple accessible routes and continual paths of travel available within a reasonable distance that would be available to you.

Per our grievance policy, you may request reconsideration if dissatisfied with the written determination. The request for reconsideration shall be in writing and filed with the CITY, to the attention of the City Manager, 23 Russell Blvd, Davis, CA, CMOweb@cityofdavis.org within thirty calendar (30) days after the ADA Coordinator's determination has been mailed to the grievant. The City Manager shall review the request for reconsideration and make a final determination within ninety calendar (90) days from the filing of the request for reconsideration.

You may also file an ADA complaint with the Department of Justice by visiting this link (online version) or you may fill out a paper copy containing the same information and mail it to the following:

U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
If you have any additional questions, you may contact me at the address, telephone number and/or email address listed below.

Jillian LeDuc
ADA Coordinator
530-757-5694
Davis
CALIFORNIA

# EXHIBIT B

**City of Davis**
**ADA Title II Records Requests/Complaints Report Log**
**2023-2026**

| Date of Request | Name | Contact Info | Reason for Request | Staff contacted | Action Taken/Date | Completed & resident contacted? |
|---|---|---|---|---|---|---|
| -6/20/23<br>-<br>12/01/24 | Mark Baker | mbaker@softlights.org | 6/20:Request for LED lights removal and investigation into LED lights harm<br>12/1: request for ADA Transition policy to include verbiage on lighting | -Stan Gryczko, PW<br>- David Lim attorney | 7/17:<br>Discussed with city attorney in July on how to proceed. We did not respond as Mr. Baker received a response in Jan '23 on the same topic | Completed. Mr. Baker was sent a response in Jan '23 to the same request. |
| 5/30/23 | [redacted] | [redacted] | Ada complaint about rainbow crosswalk painting being a safety issue | -Chief Pytel, PD | -Complaint settled and denied. There is no violation.<br>-Called ADA Info Line for guidance. | Completed. Denied request. Emailed response. |
| 6/21/23 | [redacted] | [redacted] | Request for heightened protocols and precautions at summer camp [redacted] | Jillian LeDuc<br>Marissa Rooney<br>Anne Marquez | Accommodations approved. Staff were informed on protocols, received additional [redacted] and information shared with [redacted] | Completed. Approved. |
| 10/09/23 | [redacted] | [redacted] | Barrier in private business [redacted] is blocking ADA parking spot. | n/a | Emailed and gave insight into how to file a complaint with ADA.gov. This is private business matter. | Completed. Emailed response. |
| 11/21/23 | [redacted] | [redacted] | Audible lights at 5th and B, Oak and 8th and Covell and the 113 are not loud enough | -Ryan Chapman, PW<br>-Art Robles, electrical | 11/28/23:<br>-Work request #23-004601 for 8th and Oak<br>-work request #23-004602 for 5th and B (Russell) | 12/18: waiting for work order update<br>Completed |

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/21/23 | [redacted] | | Audible lights at John Jones & Covell may be on the wrong poles. | -Ryan Chapman, PW<br>-Art Robles, electrical | - update email sent to [redacted] about work request order being completed | completed |
| 1/1/2024 | Mark Baker | mbaker@softlights.org | Request the RRFB (flashing traffic signs with LED) are removed from city | Jillian LeDuc<br>-Ryan Chapman, PW<br>Deanne Machado<br>Amy Greyson (attourney) | 1/8/24: Responded with acknowledgement of accommodation request.<br>-Research included calling ADA Hotline, FHWA civil rights team. contacted surrounding cities<br>-read over the MUTSCD<br>-1/3/24: Contacted FHWA civil rights team for follow up via email. Call with Civil Rights Specialists Michael Caliendo on 1/8<br>-Reached out to Stan Gryzco, Melissa Marshall for Public Works input<br>-Spoke with Ryan Chapman about regulations of signs. Potential ability to change RRFBS with large yellow flashing lights with slower flash sequence. All flash sequences are to code for other disability related considerations per federal regulations. | Ongoing with CMO now. 3/1/24<br>-continued emails 8/2024 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | -The MUTSCD has officially approved LED and RRFB in 11th edition.<br>-Information passed along to D. Machado from ADA Coord.<br>-2/5: consulted with with Amy Greyson from city attorneys office.<br>2/5: consultation with FHWA ADA program analyst, Morgan. They dismissed a complaint from Soft Lights based on allegations of LED harm being beyond their authority and alleged.<br>2/5: consultation with FHWA civil rights program manager whom spoke with the access board on our behalf.<br>2/8: reviewed /studied PROWAG, MUTCD, and ARCHITECTURAL AND TRANSPORTATION BARRIERS COMPLIANCE BOARD<br>2/12: discussions with legal.<br>2/12: research on pedestrian right of way, disability and pedestrian safety, department of justice<br>2/12: traffic engineer phone call to discuss costs, options, regulations, ramifications | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | 2/28: final input from legal<br>2/29: Accommodation Determination sent via email. Alternate accommodation offered and grievance procedure passed along. CMO contacted and pursuing discussions with requester. | |
| 3/1/2024 | [redacted] | | Requesting assistance or grant information or small businesses that need ADA updates. HOA association will not replace ADA non-compliant doors in their work offices. | | 3/11 Reached out for information on grant potential and assisted with some resources.<br>This matter is private business. | Private business matter- completed |
| 8/19/2024 | [redacted] | | traffic light pole are too far to reach because the pole is on a platform that keeps [redacted] from getting close enough. The bike accessible button faces the street so I can't safely push it either.<br>Cowell at the Research Park intersection, going towards the Tanglewood apartments. | Ryan Chapman | 8/19 Ryan Chapman contacted<br>9/17: Art Robles contacted, "Adding an extension on the APS buttons at this location should be possible" | |
| 9/5/24 | [redacted] | | sidewalk is deteriorating and needs attention- 300 Balboa Request #: 20638 via Gov Outreach System | Kevin Fong | 9/10: Location added to PWET Request Log to be addressed in the next 5 years | |

| | | | | | |
|---|---|---|---|---|---|
| 3/19/2025 | [redacted] | Remarks on accessibility issues with the websites [redacted] | Spoke with Leslie Fong | 3/26 Leslie Fong clarified information and ADA widget access options [redacted] emailed with more details/ | |
| 3/26/2025 | [redacted] | Concerns with compliance at Southbound Anderson at east edge of Davis Collection construction site. And east side of L Street to the north side of 2nd St near PG& E | Contacted Kevin Fong and Mitch Edwards | | |
| 9/5/24 | [redacted] | sidewalk is deteriorating and needs attention- 300 Balboa Request #: 20638 via Gov Outreach System | Kevin Fong | 9/10: Location added to PWET Request Log to be addressed in the next 5 years | |
| 1/17/24<br><br>Followed up on: 9/17/24 | [redacted] | The walk button is attached to a traffic pole. This pole is located several feet to the left of the concrete pathway that leads to the crosswalk. I can't reach the button if [redacted] is on the concrete pathway. To reach the button I'd have to [redacted] into the dirt. The dirt is muddy in the winter, but the biggest problem is that the dirt is lower than the concrete. The lip at the edge of the concrete creates problems with the [redacted]<br><br>Would it be possible to pour some | Kevin Fong | 9/19: Location added t to the next concrete project as a ADA improving. This will put it into FY 25 or later. Resident emailed. | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | [redacted] | | concrete in the space between the pole and the currently existing concrete path? | | | |
| 9/16/24 | [redacted] | | Complaint form saved in ADA coordinator file here: P:\REC\Adaptive Rec\ADA Coordinator | | 10/4: called [redacted] to discuss main concerns and get clarity on specific intersections and stops.<br><br>Will discuss [redacted] views with the Short Range Transit Plan with Unitran and PWET. | |
| | [redacted] | | Continued concerns with the compliance at various construction sites around city.<br>- L Street to the north side of 2nd St (PG& E site)<br>- Oakshade Center Davis construction project | Barbara Archer & multiple city officials contacted. | Communications team corresponded and checked in with PW dept, engineers and construction mgm. site engineers to oversee compliance concerns and clean up sites. | |
| | [redacted] | | | | | |
| 6/5/2025 | Mark Baker | mbaker@softlights.org | Email correspondence saved P:\REC\Adaptive Rec\ADA Coordinator\Mark Baker ADA requests file | | Receipt of email completed. Request for changes in city policy surrounding LED light usage. Request similar to previous 2 requests that the city have responded to and closed.<br><br>Consulted with city attorney, fleet services about patrol cars Pos, CMO and Comms responded to request on | Denial letter sent 10/22/25 from CMO |

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/12/2025 | Mark Baker | mbaker@softlights.org | Request for investigation sent to CMO, Comms, City Council | | Email correspondence saved P:\REC\Adaptive Rec\ADA Coordinator\Mark Baker ADA requests file | Comms responded with acknowledgment and attorney for review. |
| 11/18/25 | [redacted] | | ADA request for [redacted] for Nutcracker program | | [redacted] provided | |
| Dec 2025 - ongoing | Mark Baker | mbaker@softlights.org | Request for investigation sent to CMO, Comms, City Council | | Email correspondence saved P:\REC\Adaptive Rec\ADA Coordinator\Mark Baker ADA requests file | Emails every few days addressed to city manager, CMO, attorney aware. No response from me. Attorney acknowledged internally 1/5/26 4/28/26 – invited Mark to a meeting to discuss accommodations if needed |
| 2/3/26 | [redacted] | | Concerns about blocked sidewalks by vendors, no ADA parking at [redacted] | Call to CMO | Contacted [redacted] via ohone call to discuss concerns. [redacted] contacted with reminders of event access compliance. | |
| 2/8/26 | [redacted] | | Email comment about lack of disabled parking in downtown | Email sent to PWETWeb@cityofdavis.org> | Contacted via email to discuss concerns, | |

| | | | | | |
|---|---|---|---|---|---|
| 1/27/26 | [redacted] | Disabled parking complaint for [redacted] | Email sent to Ryan Chapman PWET Web davisparkin g,Antonia Dias | Contacted via phone call to discuss concerns. [redacted] contacted with reminders of event access compliance. | |
| 4/13/26 | [redacted] | ADA concerns for respite center mailed to CMO | | Called to engage in interactive process and clarify request/ accommodations needed. Notes in complaint form file | Completed. Not a ADA complaint- but public comment on the facility and services. No barrier or non compliance accommodation identified |
| 7/6/2026 | [redacted] | requested for access to a computer to be provided during public comment at city counsel meeting for demonstrating a website | | Contacted via phone and email to better understand request. Request not an ADA related matter. | Denied – presentations are not permitted during public comment |
| 7/13/2026 | [redacted] | Called in complaint about [redacted] was refused entry [redacted] on 7/11. [redacted] claimed "the city told them they have to refuse entry to [redacted] denied complainant access based on [redacted] | | | Informed caller it is a private [redacted] matter. Offered option to file with DOJ or discuss with [redacted] |

| | | | | | | |
|---|---|---|---|---|---|---|
| | [redacted] | | [redacted] | | | |
| 7/23/26 | [redacted] | | Emailed concern about accessibility at College Park- city owned, university maintained | | 8/11: Emailed PWET to discuss next steps or assessment | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

# EXHIBIT C

BY EMAIL

August 14,2026

Mark Baker
Soft Lights Foundation
9450 SW Gemini Drive
PMB 44671
Beaverton, OR 97008

Re: ADA Request for Accommodation - Auxiliary Vehicle Warning Lamps

Dear Mr. Baker,

By email dated June 2, 2026 and letter dated June 7, 2026, you requested a meeting with the City to discuss a reasonable accommodation to the City's use of emergency flashing lights, emergency sirens, and Rectangular Rapid Flashing Beacons (RRFBs) used for pedestrian safety in different locations throughout the City.[1] (Exhibits A and B.)

As an initial matter, please be advised that nothing in this letter waives the City's previously stated position that as a matter of state law, the City cannot stop use of emergency flashing lights or emergency sirens.

Nevertheless, in compliance with the City's ADA Grievance Procedure, I reached out with an offer to arrange to meet with you to discuss these matters again and attempt to reach an informal resolution of your grievance. (Exhibit F.) Ms. Chaney and I met with you on June 23, 2026, virtually per your request. You reiterated that flashing and pulsing lights, including those used on emergency vehicles and RRFB pedestrian crossing systems, trigger symptoms related to your autism and photophobia, including impaired concentration, cognitive difficulties, involuntary shutting of the eyes, and panic attacks. You allege these responses to emergency flashing lights, emergency sirens, and RRFBs make you unable to fully access City services throughout the jurisdiction.

Your primary request expressed at our meeting, as you have reiterated in numerous emails and letters to the City, is for the City to investigate the safety, legality, and use of bright LED lighting and related technologies in emergency vehicles and in RRFBs.[2] You have requested the City stop the use of such lighting and that the City conduct a self-evaluation

---

[1] The City has determined that the present request is substantially the same as your requests submitted in September 2025 (Exhibit C.1 and C.2.) The City maintains and reiterates its findings from that determination. (Exhibit D.)

[2] On February 29 2024, the City offered an alternative reasonable accommodation with respect to your request that the City discontinue use of RRFBs within the City. This letter included notice to you of your right to request reconsideration to the City Manager within 30 days of the decision. The City did not receive a request for reconsideration from you, nor did you submit the additional documentation within that 30-day period. (Exhibit E.)

process regarding program accessibility related to emergency flashing lights, emergency sirens, and RRFBs.[3]

At the meeting, we asked you to identify specific modifications that the City should investigate to assist you in navigating any or all of the issues raised in your grievances, but you did not propose any specific modifications tied to a particular facility or program. Instead, you continued to characterize the issue as a lack of adequate communication, programmatic accessibility, and architectural barriers by the City, asserting that flashing lights are ineffective or harmful communication methods and that City policies do not adequately address their use. You stated that no accommodations have been provided by employers or other agencies that address your concerns and reiterated that your request is focused on policy changes and investigation of the alleged harms associated with flashing lights.

On July 6, 2026, after our meeting, you sent the City another letter asserting the City is not in compliance with the ADA because of its use of emergency flashing lights, emergency sirens, and RRFBs. (Exhibit H.) On July 19, 2026, you sent the City an email outlining a "renewed" accommodation request in regards to high-intensity auxiliary warning lamps installed on City of Davis emergency vehicles. (Exhibit I.)

After careful investigation and evaluation of your requests, the City concluded that your requested modifications would create a direct safety risk to the public, would fundamentally alter the operation, safety, and functionality of the City's public transportation and emergency response infrastructure, and, with respect to emergency uses, would be contrary to state law.

Nevertheless, the City remains committed to providing reasonable modifications that provide meaningful access to City programs, services, and activities. As an alternative modification, the City will provide auxiliary aids designed to reduce sensory impacts during your visit, including:

- Light-filtering glasses; and
- Noise-cancelling headphones that can be worn on one ear while driving in compliance with state law.

These items are frequently used as reasonable accommodations and auxiliary aids to assist those with photophobia and noise sensitivity, reducing or eliminating symptoms such as impaired concentration, headaches, cognitive difficulties, involuntary shutting of the eyes, and panic attacks you state result from flashing lights and loud noises. These items may be borrowed from the City for the duration of any visit you make to Davis and returned upon your departure.

[3] On May 28, 2026, the City informed you by letter that it intends to initiate an update to its 2010 Self-Evaluation and Transition Plan in the 2026-2027 fiscal year and invited you to participate in that process. (Exhibit G.)

The City continues to be willing to engage with you in the interactive process to determine whether another reasonable accommodation is available.

Per the City's ADA Grievance Procedure, you may request reconsideration of this decision if you are dissatisfied with this written determination. The request for reconsideration shall be in writing and filed with the CITY, to the attention of the City Manager, 23 Russell Blvd, Davis, CA, CMOweb@cityofdavis.org, within thirty calendar (30) days after the ADA Coordinator's determination has been mailed to you. The City Manager shall review the request for reconsideration and make a final determination within ninety calendar (90) days from the filing of the request for reconsideration.

You may also file an ADA complaint with the Department of Justice by visiting this link (online version) or you may fill out a paper copy containing the same information and mail it to the following:

U.S. Department of Justice Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

If you have any additional questions, you may contact me at the address, telephone number and/or email address listed below.

Thank you for your understanding.

Sincerely,

JILLIAN LEDUC (she/her)
ADA Coordinator
530-757-5694
JLeDuc@cityofdavis.org

cc: Daryel Dunston, City Manager

Exhibits

# EXHIBIT D

YCRC
YOLO CONFLICT RESOLUTION CENTER

Phone: (530) 564-2324
PO Box 1874 Davis, CA 95617
Email: programs@yolocrc.org
Web: www.yolocrc.org

August 24, 2026

The Yolo Conflict Resolution Center (YCRC) is a non-profit community organization that offers affordable mediation and facilitation services to assist with resolution of conflicts involving a variety of issues including neighbor/neighbor disputes, landlord/tenant rental disagreements, parenting plan and divorce or separation issues, co-worker conflict, among other situations.

This letter is to confirm that the Yolo Conflict Resolution Center (YCRC) received a request for mediation services from Mr. Mark Baker. Following an individual intake meeting with Mr. Baker, YCRC made multiple attempts to contact the ADA Coordinator via email. Despite these efforts, we were unable to establish contact with the ADA Coordinator.

Because YCRC's mediation services are entirely voluntary and require the participation of both parties, we are unable to proceed with mediation at this time. Accordingly, YCRC considers its mediation efforts in this matter concluded.

Please feel free to call or email us if you have any questions or if we might be of assistance in the future.

Regards,

Juan Gomez
Mediation Services
Yolo Conflict Resolution Center
Juan@yolocrc.org
(530) 564-2324

# EXHIBIT E

REF: 74059

MEMORANDUM

The Minnesota Department of Human Rights (MDHR) has finished its investigation into this charge of discrimination (charge) and the Commissioner determines:

1. There is **PROBABLE CAUSE** to find that Respondent discriminated against Charging Party because of her disability.

Background

2. On September 28, 2022, Charging Party filed this charge and alleged Respondent discriminated against her in the area of public services, on the basis of her disability.[1] Specifically, Charging Party alleged that Respondent failed to reasonably accommodate her disability by refusing to remove or alter a strobe light at a pedestrian crossing next to her home. She claimed that after she advised Respondent that the light triggered her disability and asked for its removal or modification, Respondent ignored her and took no action to investigate her claim or address the problem, in violation of the Minnesota Human Rights Act (MHRA).

3. Respondent received a copy of the charge, provided MDHR with an answer to the charge, denied it discriminated against Charging Party, and provided documents and witness interviews to support its position. Respondent asserted that it took Charging Party's report seriously and promptly investigated whether an accommodation could be provided. It claimed that removal or replacement of the light was not warranted because the light's flashing rate was consistent with federal guidelines and removing or changing it would have a negative impact on pedestrian safety. Respondent also asserted that the cost of providing an accommodation was prohibitive.

4. Charging Party received a copy of Respondent's answer to the charge, submitted a rebuttal statement and additional documents, and participated in an investigatory interview.

5. MDHR considered all of these materials and interviewed relevant witnesses. MDHR limited its investigation to whether Respondent violated the MHRA.

Facts

6. Respondent is a city with approximately 10,500 residents. Under the MHRA, Respondent is a "public service."[2]

7. Charging Party is a woman with a disability who is a Respondent resident.[3] The symptoms of Charging Party's disability are triggered by high-luminance, strobing LED lights.

8. In approximately April 2020, several residents asked Respondent to install warning lights at a crosswalk on a public street next to Charging Party's residence. Shortly thereafter, Respondent installed a pedestrian rectangular rapid flash beacon ("RRFB") system at the crosswalk. The RRFB contained two flashing LED lights.

---

[1] Minn. Stat. § 363A.12, subd. 1.

[2] Minn. Stat. § 363A.03, subd. 35 (defining public service as "any public facility, department, agency, board or commission, owned, operated or managed by or on behalf of the State of Minnesota, or any subdivision thereof, including any county, city, town, township, or independent district in the state.").

[3] During this investigation Respondent disputed whether Charging Party was a resident. Evidence showed that she is a resident.

9. On January 4, 2022, a pedestrian approached the crosswalk and activated the RRFB. Charging Party was nearby and experienced disability-related symptoms because of the bright, flashing LED lights. Her symptoms continued into the next day, and Charging Party was unable to go to work.

10. On January 6, 2022, Charging Party emailed Respondent's Public Works Director (Director), informed him that she was a person with a disability, explained how her disability was triggered by the crosswalk RRFB, and stated, "I'm looking forward to your reply in hopes there will be a change made."[4] The Director did not respond.

11. On January 17, 2022, Charging Party emailed the Director to follow up on her request. Again, he did not respond.

12. On January 27, 2022, Charging Party sent a third email to the Director to follow up on her request and express concern for her safety. Upon receiving Charging Party's email, the Director emailed a state agency with considerable expertise in the field and asked to discuss Charging Party's concerns.

13. Later that same day, the Director replied to Charging Party's email and stated Respondent was researching the matter, had reached out to third parties, and would respond with its findings.

14. On February 4, 2022, the state agency informed Respondent that it was required to make facilities accessible to individuals with disabilities and recommended it treat Charging Party's email as an official complaint and commence an investigation. The agency further recommended that Respondent ask Charging Party questions regarding her photosensitivity rate and experience with other devices to set a direction for further conversation. The state agency did not express any concern that implementing Charging Party's request might have a negative impact on pedestrian safety.

15. Respondent decided not to ask Charging Party about her experience with other devices or her photosensitivity rate because it believed doing so would have "aggravated the situation."

16. At some point, the Director contacted a third-party vendor to explore Charging Party's request.

17. On February 8, 2022, the vendor emailed the Director a quote of $8,616.45 to replace the existing RRFB lights.[5]

18. Subsequently, the Director brought the quote for replacing the existing RRFB lights to his supervisor, Respondent's City Administrator. The City Administrator chose not to replace the existing RRFBs.

19. On February 15, 2022, Charging Party sent a fourth email to Respondent and specifically requested that it either remove the RRFBs or slow down the flashing rate. Respondent did not respond.

20. On February 23, 2022, Charging Party sent a fifth email to Respondent to follow up on her request. Respondent did not respond.

---

[4] Charging Party had an advocate who also sent communication regarding her accommodation request to Respondent. Multiple City Council members affirmatively blocked the advocate's email address in order to avoid receiving his communications.

[5] Respondent's answer suggested that this quote was for a "[replacement] module with a slower flashing rate." The Director, however, did not recall exactly how the proposed replacement module differed from the existing one.

21. On March 2, 2022, Charging Party sent a sixth email to Respondent to follow up on her request. Respondent did not respond.

22. On March 16, 2022, a pedestrian activated the crosswalk RRFB. Charging Party, who was driving near the intersection at the time, again experienced disability-related symptoms due to the lights.

23. On March 17, 2022, Charging Party contacted Respondent for a seventh time, by letter. In her letter, Charging Party detailed her March 16 experience with the RRFB and reminded Respondent that she had previously reached out numerous times, without receiving a response.

24. On March 30, 2022, the City Administrator wrote a letter to Charging Party confirming that Respondent had received numerous communications from her regarding her disability and advising that a state agency had suggested that he ask Charging Party some questions about her disability. The City Administrator further stated that Respondent had been unable to confirm that Charging Party actually lived in the city and closed by asking Charging Party to contact Respondent. Charging Party did not receive this letter.

25. On April 5, 2022, Charging Party contacted Respondent by email, reiterating that she had contacted Respondent numerous times but had been ignored. Respondent did not respond.

26. On June 10, 2022, the Director contacted the vendor with whom he had previously communicated, asking the vendor to explore whether the flashing rate of the existing RRFB could be slowed, so that full replacement might be unnecessary. A few days later, the vendor advised Respondent that it would prepare a quote. It never did so.

27. On September 9, 2023, the Director followed up with the vendor by email and asked if it had found a unit with a slower flashing rate.

28. On September 12, 2022, the vendor responded that it was unable to find a unit with a slower flashing rate than the existing RRFB unit. The vendor offered to provide recommendations for other possible replacements.

29. On September 29, 2022, the Public Works Director emailed the vendor that Respondent would "stick with what we have." Respondent explained that it "still get[s] a lot of good comments on [the existing module] and the person causing all of the trouble hasn't sent anything in a while."

30. Respondent did not notify Charging Party that it had decided to deny her accommodation request and take no further action.

Legal Standard

31. Charging Party alleged Respondent failed to reasonably accommodate her disability by removing or altering the strobe light at the pedestrian crossing next to her home. She claimed that Respondent completely ignored her repeated attempts to discuss the situation.

32. It is unlawful under the MHRA to "fail to ensure physical and program access for people with disabilities unless the public service can demonstrate that providing the access would impose an undue hardship in its operation." In determining whether providing physical and program access would impose an undue

hardship, the following factors may be considered: (1) the type and purpose of the public service's operation; (2) the nature and cost of the needed accommodation; (3) documented good faith efforts to explore less restrictive or less expensive alternatives; and (4) the extent of consultation with people or organizations who are knowledgeable about people with disabilities.[6]

Discussion

33. The evidence supports a finding that Respondent failed to reasonably accommodate Charging Party's disability. In fact, the evidence establishes that Respondent intentionally refused to engage in good faith with Charging Party and failed to take any meaningful steps to determine whether a reasonable accommodation was even possible.

34. Charging Party is a woman with a disability that is triggered by the RRFB at the crosswalk next to her home. She repeatedly asked Respondent to accommodate her by removing, replacing, or altering the RRFB, and repeatedly attempted to engage in discussions with Respondent geared at finding a cost-effective solution. Her request was facially reasonable, and Respondent was obligated to provide the accommodation unless doing so "would impose an undue hardship on its operation."[7]

35. Respondent alleged that removing or replacing the light in question posed an undue hardship because it would be cost-prohibitive and would have a negative impact on pedestrian safety.[8]

36. As discussed above, the MHRA outlines four factors which should be considered in determining whether an accommodation would impose an undue hardship.

37. With respect to the first factor, the parties agree that Respondent is a public service with a legitimate interest and role in ensuring pedestrian safety.

38. The second factor outlined in the MHRA is "the nature and cost of the needed accommodation."[9]

39. Preliminarily, the evidence shows that Respondent failed to even attempt to assess the nature of Charging Party's needed accommodation. Despite being explicitly advised by a state agency to treat Charging Party's initial inquiries as an official complaint and to engage in good faith interactive discussions with her, Respondent did none of these things.

40. Respondent requested two quotes from a vendor: (1) for replacing and (2) for adjusting the existing RRFB. Despite these requests, Respondent failed to analyze the quotes or explore or implement the vendor's recommendations.

41. The vendor provided a quote of $8,616.45 to replace the necessary equipment. Respondent alleged this was $3,000 more than the cost of initially installing the crosswalk RRFB module.

---

[6] Minn. Stat. § 363A.12, subd. 1.
[7] Id.
[8] Respondent's contention that the RRFB's "flash rate" was consistent with federal guidelines is irrelevant to the determination of whether providing an accommodation would have imposed an undue hardship.
[9] Minn. Stat. § 363A.12, subd. 1(2).

42. Respondent, however, did not bring the quote to the City Council for formal review or vote and failed to provide evidence that it conducted a cost analysis to explore implementation of the vendor's quote. In fact, evidence indicated that upon receiving the quotes, the City Administrator merely stated that Respondent had done its due diligence and determined that no further effort was warranted.

43. The vendor was unable to find a unit with a slower flashing rate and did not provide a quote to Respondent in response to that request; it offered to provide recommendations for replacement. The Public Works Director declined this offer, stating Respondent would "stick with what we have." He explained that further exploration of alternatives appeared unnecessary because Respondent "still get[s] a lot of good comments on [the existing module] and the person causing all of the trouble hasn't sent anything in a while."

44. The third factor outlined in the MHRA is "documented good faith efforts to explore less restrictive or less expensive alternatives." Here, the evidence showed that Respondent made no effort whatsoever to explore less restrictive or less expensive alternatives, despite Charging Party's repeated expressions of interest in exploring such alternatives.

45. While Charging Party contacted Respondent at least eight times concerning her accommodation request[10], Respondent ignored her.[11] In fact, Respondent conceded that it intentionally avoided contacting Charging Party because it believed doing so would have "aggravated the situation." Evidence further showed that several of Respondent's City Council members blocked her advocate's email address in order to avoid receiving the advocate's communications about Charging Party's requests.

46. Respondent claims to have finally sent a letter to Charging Party on March 30, 2022. As noted above, Charging Party never received this letter. However, she sent Respondent an email six days later, and Respondent again failed to respond. This failure indicates that the March 30, 2022, letter was merely a performative gesture; it was clearly not a good faith effort to communicate with Charging Party about her accommodation.[12]

47. The fourth factor outlined in the MHRA is "the extent of consultation with knowledgeable disabled persons and organizations." Again, this factor supports a probable cause finding. As noted above, Respondent actively avoided any contact with Charging Party's advocate. And while the evidence showed that Respondent did reach out to a state agency with relevant expertise, it failed to act on the agency's recommendations or suggestions.

48. Finally, while Respondent asserted that granting Charging Party's accommodation request would have had a negative impact on public safety, there was no evidence that it ever considered any safety data or otherwise analyzed the safety implications, if any, of providing an accommodation.

49. In sum, evidence demonstrated Respondent failed to engage in the reasonable accommodation process to find an accommodation or an alternative.

---

[10] Charging Party's advocate also contacted Respondent numerous times during this time frame, but similarly received no response.

[11] Charging Party received one response from the Public Works Director on January 27, 2022, claiming that Respondent would "respond with our findings as soon as we have collected the information we are seeking." Charging Party, however, never received a response with Respondent's findings.

[12] Respondent's lack of good faith is underscored by its communication with the vendor, in which it advised that it was no longer interested in discussing alternatives because "the person causing all of the trouble hasn't sent anything in a while."

Conclusion

50. THEREFORE, MDHR finds that there is **PROBABLE CAUSE** to find that Respondent discriminated against Charging Party, in violation of the MHRA.[13]

**Minnesota Department of Human Rights**

**FOR THE DEPARTMENT BY:**

Dated: June 15, 2023

Rebecca Lucero, Commissioner

[13] Minn. Stat. § 363A.12, subd. 1.

# EXHIBIT F

U.S. Department
of Transportation
**Federal Highway
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

October 19, 2022

In Reply Refer to: HCR-40
DOT#2022-0375

Mark Baker
9450 SW Gemini Drive PMB 44671
Beaverton, OR 97008

Dear Mr. Baker:

This letter acknowledges receipt by the Federal Highway Administration (FHWA) Office of Civil Rights of the allegations you submitted to the US Department of Justice, which transferred your correspondence to the US Department of Transportation, against the cities of Ashland, OR, Little Canada, MN, and Penn Yan, NY (collectively, "the Cities"), alleging violations of the Americans with Disabilities Act (ADA) and/or Section 504 of the Rehabilitation Act of 1973. In particular, you allege that the Cities' installation and use of Rapid Rectangular Flashing Beacons (RRFBs) discriminates against you and other individuals with disabilities by inducing disorientation, visual impairment, anxiety, fear, seizures, and/or other medical/health issues. After review and consideration, the FHWA has determined not to conduct further investigation and will dismiss the complaint.

In enacting revisions to its Title II ADA regulations in 2010, the US Department of Justice (DOJ) noted that there is no statutory requirement that every Title II complaint receive a full investigation. *See* Nondiscrimination on the Basis of Disability in State and Local Government Services, Final Rule, 75 Fed. Reg. 56163, 56228 (Sept. 15, 2010). An enforcement agency must consider a number of factors in deciding whether to conduct a full investigation, such as whether a violation may have occurred, whether the agency's limited resources are best spent on one complaint or another, and whether particular enforcement action best fits the agency's overall policies.

Based on an evaluation of these factors, FHWA has determined to dismiss this complaint without further investigation by the FHWA Office of Civil Rights. The allegations you have raised about the health impacts of RRFBs raise complex issues related to the regulation of all Light Emitting Diode (LED) lights, not just those used in RRFBs, that extend beyond FHWA's authority.

Please note that you may file a private suit pursuant to Section 203 of the ADA at any time, regardless of the FHWA disposition of this matter, per 28 CFR 35.172(d).

U.S. Department
of Transportation
Federal Highway
Administration

1200 New Jersey Avenue, SE.
Washington, DC 20590

If you have any questions about this letter, please contact Sharon Field at sharon.field@dot.gov.

Sincerely,

SHARON JEAN FIELD

Digitally signed by SHARON JEAN FIELD
Date: 2022.10.19 17:24:39 -04'00'

Sharon J. Field
ADA Team Leader
FHWA Office of Civil Rights